## Powell v. Janssen Pharmaceuticals, Inc.

*Rosemary Pinto, Scott A. Love, Shelley V. Hutson, Blake A. Deady, Eric H. Weitz* and *Danyl S. Patterson*, for plaintiffs.

*Melissa A. Graff, Kenneth A. Murphy, Molly E. Flynn* and *Kathryn E. Deal*, for defendant.

OVERTON, *J.*, April 25, 2014—This matter is before the appellate court in response to the order reproduced below, issued on December 3, 2013.

> Upon consideration of defendant Janssen Pharmaceuticals, Inc. motion for post-trial relief, and any response thereto, it is hereby ordered that said motion is denied.

Defendant Janssen Pharmaceuticals filed a timely appeal.

## FACTS

In April 2005, Haley Powell, plaintiff and guardian of Brayden Gurley, experienced an epileptic episode in school that caused her to lose consciousness. (N.T. 11/8/2013 am, at p. 9-11). Plaintiff testified that this was the first time she had suffered a seizure, and subsequently sought treatment from a neurologist. Plaintiff was treated and diagnosed by her current neurologist, Dr. Warner. In May 2005, Dr. Warner diagnosed plaintiff as having

juvenile myoclonic seizures. (N.T. 11/8/2013 am, at p. 12). Initially, Dr. Warner prescribed plaintiff Keppra to control her seizures. Plaintiff confirmed that Keppra did in fact help control her seizures, and maintained she had only experienced one seizure since the initial seizure at school. (N.T. 11/8/2013 am, at p. 13-14). Plaintiff experienced other physical problems after she began taking Keppra. On November 16, 2005, plaintiff visited Dr. Warner and complained that she was having issues with hand tremors. During this visit Dr. Warner prescribed plaintiff Lexapro to control her hand tremors. (N.T. 11/8/2013 am, at p. 9-11). However, a few weeks later plaintiff complained that Lexapro was difficult to ingest and caused her to be nauseated. Dr. Warner determined that plaintiff should stop taking Lexapro. In addition to the hand tremors, Plaintiff also testified she had experienced headaches two weeks after beginning her Keppra prescription. (N.T. 11/8/2013 am, at p. 22-23).

In March 2006 Dr. Warner prescribed Topamax to control plaintiff's headaches. *Id.* When Dr. Warner prescribed Topamax, plaintiff was not aware that it could possibly cause birth defects such as cleft lip, cleft palate or oral palate. (N.T. 11/8/2013 am, at p. 23). Dr. Warner testified his decision to prescribe Topamax would have been impacted had he known of the potential risks that were associated with the medication. (Dr. Warner Dep. 69:20 — 70:18, July 30, 2012). At the time Dr. Warner prescribed Topamax to plaintiff, Topamax was listed as a Category C drug.[1] Plaintiff claimed Dr. Warner only

---

1. Both the 2006 and 2007 Toparmax label in the Physician's Desk Reference ("PDR") stated the following concerning pregnancy risks: Pregnancy: Pregnancy Category C — Topiramate has demonstrated selective developmental toxicity, including teratogenicity, in experimental animal studies.
......

warned her that Topamax could cause weight loss and that she was not informed of any other possible side effects.

Plaintiff also testified that she was instructed to take Topamax twice daily (50 mg during the day and 50mg at night). (N.T. 11/8/2013 am, at p. 32). Plaintiff testified that she took Topamax from March 2006 until December 1, 2007. (N.T. 11/8/2013 am, at p. 42). Although the last prescription filled under plaintiff's name was in June 2007, plaintiff was able to continue taking Topamax through her mother, Sandra Powell's prescription from June 2007 through December 1, 2007. (N.T. 11/8/2013 am, at p. 34-37).[2]

On November 19, 2007, plaintiff found out she was pregnant with her son, Brayden Gurley. She and Michael Gurley had conceived Brayden sometime in late October 2007. (N.T. 11/8/2013 am, at p. 43). On November 21, 2007, plaintiff contacted Dr. Warner to inform him that she was pregnant and to receive instructions on how to proceed with taking her medications. (N.T. 11/8/2013 am, at p. 34-37). Dr. Warner then advised plaintiff that

---

There are no studies using Topamax in pregnant women. Topamax should be used during pregnancy only if the potential benefit outweighs the potential risk to the fetus. In post-marketing experience, cases of hypospadias have been reported in male infants exposed in utero to topiramate, with or without other anticonvulsants; however, a causal relationship with topiramate has not been established. Plaintiff's exhibit P-17, P-18.

2. Sandra Powell testified she gave her daughter, Haley Powell, her prescription for Topamax from June 2007 until Haley Powell informed her doctor that she was pregnant. Sandra Powell testified her family was having financial issues at the time. At trial Sandra Powell stated, "Because Haley's was 50 milligrams and mine was 100, and so I continued to get my prescription filled and I didn't Haley's at that time because my prescription would last Haley two months and that saved $35 was our co-pay. I know that don't sound like much, but when you are living paycheck to paycheck, $35 can make a difference in a degree in your heat or air, it can make a difference in your groceries that week. Because we really lived on a very, very tight budget and it was hard."
N.T. October 31, 2013 pm, p. 28-30

she should begin to taper off the Topamax. Following Dr. Warner's instruction, plaintiff began to reduce her intake of Topamax. (N.T. 11/8/2013 am, at p. 43). Plaintiff completely stopped taking Topamax by December 1, 2007. (N.T. 11/8/2013 am, at p. 42).

When plaintiff was twenty-seven weeks pregnant she learned that her son had a birth defect. Through an ultrasound, it was discovered in utero that Brayden Gurley had a cleft lip on the right side of his mouth. Plaintiff testified that the extent of Brayden Gurley's birth defect was unknown and would only be determined after he was born. (N.T. 11/8/2013 am, at p. 50). Plaintiff testified that prior to Brayden Gurley's birth she went to a genetics group and was informed the birth defects were likely not genetically inherited. (N.T. 11/8/2013 am, at p. 50). On July 7, 2008, Brayden Gurley was born with a right side unilateral cleft lip and gum line defects. (N.T. 11/8/2013 am, at p. 52-53). On October 1, 2008, Brayden Gurley had surgery to correct his cleft lip. (N.T. 11/8/2013 am, at p. 55).

Plaintiff claimed that the surgery was an overall success but Brayden Gurley still has a scar on his lip as evidence of the surgery. She testified, "he [Brayden] has a line from his nose to his lips. The scar is red and a scar under his nose, where they cut his nose during surgery." (N.T. 11/8/2013 am, at p. 59). Additionally, plaintiff stated that Brayden Gurley is embarrassed because of his scar, shy with people he does not know and covers his mouth when taking pictures. (N.T. 11/8/2013 am, at p. 65-66). Due to the notch in Brayden Gurley's gum, his tooth never grew in correctly and makes it appear as if he is missing a tooth. (N.T. 11/8/2013 am, at p. 58-59). Moreover, plaintiff stated that due to the cleft lip, Brayden Gurley has difficulties with his speech and becomes extremely

frustrated when people cannot understand him. Brayden Gurley is currently seeing a speech therapist twice a week to address this issue. (N.T. 11/8/2013 am, at p. 63-64).

Besides Brayden Gurley's continued treatment with his speech therapist, he regularly visits a plastic surgeon as part of the cleft lip and palate team. (N.T. 11/8/2013 pm, at p. 29-33). Valeri Parisi, R.N. and certified life planner, testified Brayden Gurley would likely have to undergo alveolar graft surgery to repair the notch in his gums.[3] (N.T. 11/8/2013 pm, at p. 27). Likewise, Brayden Gurley will continue to need audiology evaluations which tests his hearing. Additional treatments that Brayden Gurley may need in the future include, but are not limited to, psychological evaluations, dental care related to his dental abnormalities, rhinoplasty for his nasal deformity and all costs related to follow-up medical care, visits and medications related to correctional surgery. (N.T. 11/8/2013 pm, at p. 31-38).

## PROCEDURAL HISTORY

On May 19, 2011 Haley Powell, individually and as guardian of Brayden Gurley, along with Michael Gurley (plaintiffs), filed a complaint for negligence based on a theory of products liability against the defendant, Janssen Pharmaceuticals, Inc. (hereinafter "appellant"). The plaintiffs alleged that the appellant failed to warn plaintiff and her prescribing healthcare provider about the risk of birth defects associated with the ingestion of Topamax during pregnancy, including the risk of cleft lip. Plaintiffs asserted appellant's failure to warn of the risks associated

---

3. Valeri Parisi, R.N. based her testimony and life plan for Brayden Gurley on various medical records, Dr. Draisen's deposition and information retrieved from both Ms. Powell and Mr. Gurley. All estimates in Ms. Parisi's life plan for Brayden Gurley were projected on an annual basis and up until Brayden Gurley reaches the age of 21.

with Topamax resulted in Brayden Gurley being born with a right side cleft lip. On November 21, 2011 appellant's counsel filed an entry of appearance with this court and demanded a jury trial. On April 1, 2013 appellant requested that this court enter summary judgment against plaintiffs on each of the claims contended in their short-form complaint. On August 27, 2013 the appellant's motion for summary judgment was denied in part and granted in part. Specifically, plaintiffs' failure to warn claim against appellant proceeded to trial. On October 29, 2013 this trial commenced.

On November 18, 2013, the jury returned a verdict in favor of the plaintiffs indicating that appellant was negligent in its failure to adequately warn plaintiff's prescribing physician of the risk of birth defects associated with the use of Topamax and was the proximate cause in bringing about Brayden Gurley's harm. Apparently the jury accepted plaintiff's assertions and awarded Brayden Gurley the total sum of $ 10,955,000, $335,000 for future health care costs and the balance of $10,620,000 for non-economic loss. Delay damages in the amount of $700,294.62 were added to the verdict, thus judgment was entered for Brayden Gurley for the total amount of $11,655,294.62.[4] On December 3, 2013, this court denied the appellant's post-trial motion. On January 6, 2014, appellant filed a timely appeal. Statements of matters complained of on appeal were requested and properly tendered on January 27, 2014 along with an order requesting the notes of testimony from the trial. Appellant raised the following issues in the statement of matters complained of on appeal pursuant to Pa. R.A.P. 1925 (b):

---

4. In an order dated December 5, 2014, this court granted plaintiffs' petition for delay damages pursuant to rule 238. *See* Pa. R.C.P. 238 (3) (b)(1)(ii).

1. Federal Preemption: This court erred in failing to rule that federal law preempts the negligent failure-to-warn claims filed by plaintiffs Haley Powell and Michael Gurley, individually and as legal guardians of minor-plaintiff Brayden Gurley (collectively, "plaintiffs"). *First*, the record contains clear evidence that the United States Food and Drug Administration ("FDA") would not have approved the change plaintiffs allege should have been made to the Topamax labeling (to assert that Topamax caused oral clefts) prior to October 2007, and plaintiffs' claims are thus preempted as explained in *Wyeth v. Levine*, 555 U.S. 555 (2009) and its progeny. *See* defs.' mot. for post-trial relief ("post-trial mot.") at 19-23, ¶¶ 54-64; motion for directed verdict ("Mot. for dir. verdict") at Tr. Trans, at 91:25-92:11, dated Nov. 14, 2013 (A.M.). Second, plaintiffs' claims relating to Topamax's pregnancy category are preempted by federal law because FDA has sole authority to determine and designate a drug's pregnancy category. In that Janssen could not unilaterally change Topamax's pregnancy category, any claim based upon Janssen's alleged failure to request that FDA change the pregnancy category is preempted as explained in *PLIVA v. Mensing*, 131 S. Ct. 2567 (2011), and related cases on conflict or impossibility preemption. *See* post-trial mot. at 24-26, ¶¶ 65-71. Given that the claims were preempted, the court erred in denying defendant's motions for directed verdict and judgment notwithstanding the verdict.

2. Alternatively, a new trial is warranted because the court erred in failing to give proper instructions as to federal preemption and failing to include a question on the verdict form whether there was clear evidence that FDA would not have approved plaintiffs' suggested warnings at the relevant time. *See* post-trial mot. at

26-27, ¶¶ 72-73; defendant's first am.proposed points for charge ("pr. pts. for charge"), nos. 39-39, dated November 14, 2013; defendant's second am. proposed verdict sheet ("pr. verdict sheet"), No. 3, dated November 14, 2013. The absence of these instructions and interrogatory prejudiced defendants and requires a new trial. The court also erred in failing to instruct the jury as to the role of FDA, despite allowing plaintiffs to introduce evidence and argument on FDA rules and regulations. *See* post-trial mot. at 41-42, ¶¶ 121-125; pr. pts. for charge, nos. 36-43. Allowing plaintiffs to introduce evidence and argument while refusing defendant's proposed instructions concerning that evidence and argument was unfairly prejudicial to defendant and requires a new trial.

3. Causation: Ms. Powell allegedly received Topamax from two sources — her prescribing physician, Dr. Warner, whose prescription she did not fill at the relevant time; and her mother, who in turn had been prescribed Topamax for her personal use by a different physician, Dr. Keizer. The testimony presented at trial was that the Topamax that Ms. Powell allegedly took at the time she became pregnant with Brayden was the Topamax that Dr. Keizer had prescribed for Ms. Powell's mother. Tr. trans, at 28:7-29:14, dated Oct 31, 2013 (P.M.) (trial testimony of Mrs. Sandra Powell); tr. trans, at 33:16-36:16, 37:16-18, dated Nov. 8, 2013 (A.M.) (trial testimony of Ms. Haley Powell). Dr. Keizer, however, did not testify at trial at all. Accordingly, there was no basis on which a jury could have found that (a) the Topamax label did not adequately warn Dr. Keizer of the risk of oral clefts associated with maternal use of Topamax during pregnancy, (b) Dr. Keizer lacked independent knowledge of this risk, or

(c) had the 2006 Topamax label contained different or additional information, Dr. Keizer would have changed his decision to prescribe Topamax to Ms. Powell's mother and, as a result, Brayden's injuries would have been avoided. As such, plaintiffs did not establish that Janssen's negligent failure to warn was the cause of Brayden's injuries. *See* post-trial mot. at 5-8, ¶¶ 17-25; mot. for comp. nonsuit at 12-15; mot. for dir. verdict at tr. trans. 93:12-25, dated Nov. 14, 2013 (A.M.).

4. Dr. Warner's testimony also does not establish causation. To the contrary, his testimony established that he knew of the risks of Topamax, Warner tr. dep. 31:8-14, 81:6-14; that he relies on sources other than the product label to acquire information about the medications he prescribes, *id.* at 8:18-9:2; that he advised Ms. Powell not to become pregnant when taking Topamax, *id.* at 30:22-31:4; and that when he learned of her pregnancy, he instructed Ms. Powell to stop taking Topamax, *id.* at 63:2-6. Accordingly, there are three reasons that the jury could not find that defendant's labeling caused Dr. Warner to prescribe Topamax to Ms. Powell, thereby causing Brayden Gurley's injury: *first*, Dr. Warner did not prescribe the Topamax that Ms. Powell claims she took when she became pregnant in October 2007; *second*, Dr. Warner had independent knowledge of the potential risk of birth defects when he prescribed the medication in 2006 and advised her to use "extreme caution" to avoid pregnancy while taking the medication; and *third*, there was no evidence that Dr. Warner ever read or relied upon the Topamax label when deciding to prescribe the medication to Ms. Powell in 2006 or that, had the 2006 Topamax label contained different or additional information, he would have changed his prescribing decision and Brayden's

injuries would have been avoided. *See* post-trial mot. at 10-13, ¶¶ 32-38; 8-10, ¶¶ 26-31; 10-13, ¶¶32-38; 13-15, ¶¶ 39-46. *See also* mot for dir. verdict at tr. trans. 92:19-93:11, dated Nov. 14,2013 (A.M.); mot. for comp. nonsuit at 4-11.

5. Alternatively, a new trial is warranted because the court erred in failing to give proper instructions as to proximate causation. *See* post-trial mot. at 15-19, ¶¶ 47-53; pr. pts. for charge, nos. 21-23, 26, 30-31; pr. verdict sheet, nos. 1-2, 4-5. Specifically, the court (a) failed to instruct the jury as to which physician Janssen owed a duty, *see* post-trial mot. at ¶ 47, (b) failed to instruct the jury as to the consequences of Dr. Keizer and/or Dr. Warner's independent knowledge of the risks of Topamax, *id.* (c) failed to instruct that plaintiffs must prove that Dr. Keizer and/or Dr. Warner read and relied upon the warnings provided by Janssen when prescribing Topamax to Ms. Powell, *id.* at ¶ 48, and (d) failed to instruct that plaintiffs must prove that Dr. Keizer and/or Dr. Warner would not have prescribed Topamax to Ms. Powell if additional warnings had been provided in the Topamax label, *id.* Additionally, the court erred in failing to include specific verdict questions on Dr. Keizer and Dr. Warner's knowledge of the risks associated with Topamax use during pregnancy, the duty to read the label, and the scope of the duty to warn. *See id.* at ¶ 49. The absence of these instructions and interrogatories prejudiced defendants and requires a new trial.

6. Statute of Limitations: Pursuant to Pennsylvania's borrowing statute, plaintiffs Haley Powell and Michael Gurley's individual claims for pecuniary loss/medical expenses are barred by Pennsylvania's two-year statute

of limitations. *See* post-trial mot. at 27-30; ¶¶ 74-84; mot. for dir. verdict at tr. trans. 92:12-18, dated Nov. 14, 2013 (A.M.); defendant's motion for summary judgment, dated April 1, 2013 (control no. 13040566), at 17-20. The unrebutted testimony at trial was that as soon as Dr. Warner learned that Ms. Powell was pregnant in November 2007, he told her to taper off and stop taking Topamax. Warner Tr. Dep, 63:2-6; pls.' tr. ex. 438. The evidence also established that in 2006 and 2007, prior to Brayden's conception, Dr. Warner had advised Ms. Powell of the potential risks of birth defects associated with the use of antiepileptic drugs during pregnancy. Warner Tr. Dep. 81:16-82:9; 82:12. Further, Dr. Warner testified about the conversation referenced in his March 27, 2006 record for Ms. Powell: "We did discuss potential side effects of the medication and potential birth defects. She is to use *extreme caution* and to use birth control to help prevent unwanted pregnancy while on medication." *Id.* at 30:22-31:4 (emphasis added). Brayden was born on July 7, 2008, which is the latest date that Ms. Powell knew of his injuries and should have known of their potential cause. *See* short-form complaint at ¶ 3. A. Nonetheless, plaintiffs did not initiate this action until November 7, 2011. The court therefore erred in denying defendant's motions for summary judgment, directed verdict and judgment notwithstanding the verdict.

7. Alternatively, a new trial is warranted because the court abused its discretion in excluding Ms. Powell's medical records, despite the fact that they documented the discussions Ms. Powell and her doctor had about the medicines she was taking and whether those medicines were related to Brayden's injury. *See* post-trial mot. at 30-31, ¶¶ 85-88. These documents would have provided

further evidence that Ms. Powell and Mr. Gurley knew or should have known of their potential claim, but failed to file this action within the limitations period. Because the exclusion of these records was improper and unfairly prejudicial, a new trial is warranted.

8. Comparative Negligence: A new trial is warranted because the court erred in refusing to instruct the jury about Ms. Powell's comparative negligence and refusing to ask the jury to apportion the damages. *See* post-trial mot. at 42-43, ¶¶ 126-129; pr. pts. for charge, nos. 24-35; pr. verdict sheet, no. 12-14. The undisputed evidence demonstrated that (a) Ms. Powell was instructed to use "extreme caution" to avoid pregnancy while taking medications such as Topamax, (b) Ms. Powell failed to use adequate birth control and became pregnant against her physician's advice, and (c) Ms. Powell consumed medication provided to her by her mother, Mrs. Sandra Powell. Despite this evidence, the court refused to instruct the jury that it must determine whether "Ms. Powell acted negligently by failing to adhere to the directions given to her by Dr. Warner" or "by using medication not prescribed to her." Further, the jury was not instructed that, if it found that Ms. Powell was negligent, it must also "determine what percentage of negligence is attributable to plaintiffs" and was not asked to apportion damages on the verdict sheet. The absence of these instructions and interrogatories requires a new trial.

9. Erroneous Evidentiary Rulings: The court abused its discretion in permitting plaintiffs to present irrelevant and unfairly prejudicial evidence and argument that certain language contained in the FDA-mandated informed consent forms should have been included

in the contemporaneous Topamax label. *See* post-trial mot. at 31-34, ¶¶ 91-97; defendant's mot. *in limine* no. 8 to exclude evidence or argument of informed consent forms, dated June 10, 2013 (control no. 13061132) ("Mot. *in limine* no. 8"); order, dated September 25, 2013 (denying same). This was error because the evidence — presented before and at trial — established that the reason for and purpose of an informed consent form is different than that for a product label, and that the audiences of each are also separate and distinct. *See* mot. *in limine* no. 8 (citing testimony from Janssen employees). The prejudicial evidence and argument was presented over objection, and included (a) plaintiffs' exhibits P12, P18 and P22 (Suggested informed consent forms); (b) testimony by plaintiffs' regulatory expert, Dr. Peggy Pence, that the statements in defendant's informed consent forms were not publicly available to healthcare providers; and (c) testimony by Janssen's employees, Caryn Kurland and Cathy Ellis discussing the language within the forms. *See* post-trial mot. at 32, ¶ 92(a)-(f). The admission of the informed consent forms, as well as related testimony and argument by counsel, was unfairly prejudicial and requires a new trial.

10. The court erred in permitting plaintiffs to introduce irrelevant and unfairly prejudicial evidence of Adverse Event Report ("AERs") data. *See* post-trial mot. at 34-36, ¶¶ 98-105; defendant's mot. *in limine* no. 4 to exclude evidence of or reference to adverse event reports, dated June 10, 2013 (control no. 13061128); Tr. trans. 23:8-14, dated October 28, 2013 (P.M.) (granting defendant's motion, in part, to exclude post-conception AERs; denying, in part, as to pre-conception AERs). That evidence, presented over objection, included (a)

plaintiffs' trial exhibit P10, P13 and P14; (b) testimony by Janssen employee, Michael Kaufman; and (c) testimony by Dr. Pence. *See* post-trial mot. at 35, ¶ 99(a)-(i). The evidence should not have been admitted because plaintiffs failed to establish any substantial similarity between the circumstances surrounding the incidents mentioned in the AER data and the facts of this case. Additionally, after allowing the evidence, the court erred by failing to instruct the jury as to the purpose of AER data. *See* pr. pts. for charge, no. 44. Allowing this evidence while refusing defendant's proposed instructions concerning that evidence and argument requires a new trial.

11. The court erred in permitting plaintiffs to introduce irrelevant evidence that postdated Ms. Powell's conception of Brayden and the inception of his injury, despite the court's ruling on a motion *in limine* that post-conception evidence was inadmissible for the purpose of imputing negligence. *See* post-trial mot. at 36, ¶¶ 106-109; defendant's mot. *in limine* no. 7 to preclude plaintiffs from introducing evidence of subsequent remedial measures including revisions to Topamax label and all medical literature and regulatory communications after date of conception, dated June 10, 2013 (control no. 13061131); order, dated September 25, 2013 (granting same). That evidence presented over objection, included (a) testimony by current of former Janssen employees David Biondi, M.D., Edward Osifchin, and Phillip Pierce, discussing medical literature, data and/or analyses that did not exist at the time that Ms. Powell took Topamax and Brayden was conceived; and (b) testimony by plaintiffs' experts regarding scientific literature that was published after conception. *See* post-trial mot. at 36, ¶ 107. None of

this evidence was probative of whether defendant was negligent in failing to provide an adequate warning at the time of the injury. Additionally, after allowing the evidence, the court erred by failing to instruct the jury of the limited relevance of evidence post-dating conception. *See* pr. pts. for charge, no. 20. Allowing this evidence while refusing defendant's proposed instructions concerning that evidence and argument requires a new trial.

12. The court erred in allowing plaintiffs' expert, Dr. Richard Finnell, to present novel science to the jury. *See* post-trial mot. at 37-40, ¶¶ 110-116. At trial, over objection, Dr. Finnell offered expert opinion testimony regarding a possible mechanism of action by which he contends Topamax may cause birth defects, including cleft lip, even though Dr. Finnell agreed that (a) no peer-reviewed journal has published literature in which his proposed mechanism has been "associated with teratogenicity of any compound known to man," and (b) he is not aware of any paper, poster or presentation that says Topamax causes malformations of any type in humans because of his proposed mechanism of action. *See* post-trial mot. at 37-39, ¶¶ 110, 114; defendant's mot. to exclude causation testimony of Dr. Richard Finnell, dated April 22, 2013 (control no. 13042742); order, dated September 25, 2013 (denying motion "without prejudice to raise any appropriate evidentiary objections before the assigned trial judge"); tr. trans, at 130:9-139:9, dated October 28, 2013 (A.M.) (objecting to Dr. Finnell's testimony); tr. trans, at 63:15-64:8, dated November 6, 2013 (A.M.) (same). A new trial is warranted because Dr. Finnell's testimony concerning novel science amounted to nothing more than his personal theory, was likely to mislead the jury, and

resulted in unfair prejudice to defendant.

13. Likewise, the court erred in permitting plaintiffs' expert, Dr. Jeffrey Noebels, to present novel science to the jury. *See* post-trial mot. at 39-40, n.5. At trial, over objection, Dr. Noebels offered expert opinion testimony regarding a possible mechanism of action by which he contends Topamax may cause birth defects, including cleft lip, even though his opinion, as Dr. Finnell's, was not recognized by the scientific community. *See* post-trial mot. At 37-39, ¶¶ 110, 114; defendant's mot. to exclude expert testimony of Dr. Jeffrey L. Noebels, dated May 1, 2013 (control no. 13050329); Order, dated September 25, 2013 (denying same); tr. trans. 70:14-71:24, dated November 4, 2013 (P.M.) (objecting to same). Moreover, Dr. Noebels's testimony advanced a mechanism of action that was distinct from, and indeed contradictory to, the theory advanced by Dr. Finnell. *See* trial tr. at 71:10-13, dated Nov. 4, 2013 (P.M.); *see generally id.* at 68:11 -71:24 (describing his theory). A new trial is warranted because Dr. Noebels's testimony concerning a second possible mechanism of action that was unsupported by the scientific community amounted to nothing more than his personal theory, was likely to mislead the jury, and resulted in unfair prejudice to defendant.

14. The court erred in permitting plaintiffs to present cumulative expert testimony from Dr. Finnell and Dr. Noebels as to why they believe Topamax is associated with oral clefts. *See* post-trial mot. at 40-41, ¶¶ 117-120. A new trial is warranted because the prejudicial effect of this cumulative testimony outweighed any probative value.

15. Remittitur: The court erred in refusing to grant

defendant's motion for remittitur. *See* post-trial mot. at 43-46, ¶¶ 130-140. In this case, plaintiffs were awarded $10,620,000 for noneconomic loss and $335,000 for future health costs. The disparity between the future medical costs and non-economic loss, along with the nature and extent of Brayden's injury, demonstrates that the award was excessive and that remittitur was appropriate.

This opinion is offered in response to said appeal.

## DISCUSSION

A. Whether Appellant is Entitled to JNOV or a New Trial Based On Claims of (1) Federal Preemption, (2) Exclusion of Medical Records, and (3) Comparative Negligence

The appellant Janssen Pharmaceutical, Inc. makes several claims for failure to grant a new trial, a request for judgment notwithstanding the verdict and/or a directed verdict. These claims are without merit.

First, we must address the standards that the appellant must meet.

As an initial matter, the decision whether to deny or grant a motion for a new trial rests soundly within the discretion of the trial court. *Houseknecht v Walters*, 590 A.2d 20 (1991). In a negligence case, a new trial is appropriate only where substantial reason exists. *Solomon v. Baum*, 560 A.2d 878 (1989). Substantial reason exists where there was a manifest abuse of discretion or a clear error of law. *Commonwealth v. Chanda*, 485 A.2d 867 (1984). There were no "manifest abuses of discretion" in this case.

Furthermore, in reviewing a decision whether or not

to grant judgment in favor of one of the parties, a court must "consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner." *Walker v. Grand Central Sanitation, Inc.*, 634 A.2d 237, 240 (Pa. Super. 1993). The standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical." *Brown v. Philadelphia College of Osteopathic Medicine*, 760 A.2d 863, 868 (Pa. Super. 2000). A trial court's grant or denial of a judgment notwithstanding the verdict will be reversed only when there is an abuse of discretion or an error of law that controlled the outcome of the case. *Mitchell v. Moore*, 729 A.2d 1200,1203 (Pa. Super. 1999). There are two bases upon which a judgment N.O.V. can be entered one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure. *Campo v. St. Luke's Hospital*, 755 A.2d 20, 23 (Pa. Super. 2000). Each claim will be discussed in turn and each claim is without merit.

1. Federal Preemption Does Not Apply

The plaintiffs' negligent failure to warn claims are not preempted by federal law in this matter, were ruled on properly, and do not warrant a new trial. "[I]t has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times." *Wyeth v. Levine*, 555 U.S. at 570-71. Moreover, a drug company is "charged both with drafting

an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market." *Id.* at 571. Thus, when the FDA approves a drug's label, that approval does not preempt state-law failure-to-warn actions against the manufacturer. *Id.* at 573-74.

In *Wyeth*, the Supreme Court specifically held it is the duty of the manufacturer to provide an accurate and sufficient label for the FDA's approval. Moreover, the court in Wyeth asserted the FDA's approval would not affect a failure-to-warn claim against a manufacture. Dr. Peggy Pence testified regarding whose responsibility it was to update the Topamax label. Dr. Pence testified that the appellant was to provide an update to the FDA on any relevant information pertaining to Topamax, especially if that information could adversely affect the welfare of the patient.[5] Conversely, appellant's expert witness and regulatory consultant, Dr. Dena Hixon, testified at trial that both the company and the FDA were responsible for the content of the label. (N.T. 11/12/2013 pm, at p. 40). Given this was conflicting testimony it was left to the jury to make the ultimate determination as to which expert

---

5. Q: Who is responsible for making sure that the label is accurate at all times?

A: Always the company who owns the drug is responsible for maintaining and making sure that label is accurate and complete with the important information, again I want to stress that the important information the doctor needs to know to make prescribing decisions and to counsel patients.

N.T. 10/29/2013 pm, p. 59.

...

Q: Let me ask you Dr. Pence, does it have anything to do with the manufacturer's responsibility to keep a label updated, what the manufacturer handed to the FDA?

A: No, it does not. As I said, there are two audiences, one is the FDA and one is the doctor. The manufacturer has responsibility for the label and for keeping that label updated with safety information at all times. That's why the CBE exists, where they can make that unilateral update to the labeling and get it out to doctors. *Id.* at p. 100.

opinion or opinions to accept regarding this issue.[6]

Moreover, this court made it clear that the jury as the ultimate fact finder would make the decision in this matter. The issue in this case was not one of preemption but failure-to-warn, appellant claims they are entitled to a new trial because this court failed in giving instruction or adding a question on the verdict sheet related to preemption. However, based on the applicable case law and facts of this case, this court did not include a verdict sheet question on preemption or charge the jury on preemption. Whether appellant was negligent in failing to warn was the liability issue for the jury to determine in this matter and not preemption. It was not the juries' duty to determine whether federal law preempted because it was not the issue in this case.[7]

In order to further support their preemption argument, appellant claims the holding in *PLIVA, Inc. v. Mensing*, proves they are entitled to a new trial. *See PLIVA. Inc. v. Mensing*. 131 S. Ct. 2567, 2571,180 L, Ed. 2d 580 (2011). However, the court in *PLIVA. Inc.* held, "the federal statutes and regulations that apply to brand-name drug manufacturers differ, by congress' design,

6. The jury was instructed on how the credibility of witness testimony was determined by them.
  Court: "When judging witnesses, weigh the testimony of each witness and give it the weight that, in your judgment, it is fairly entitled to receive. The matter of the credibility of a witness, that is, whether the testimony is believable in whole or in part, is solely for your determination." N.T. 11/15/2013 pm, at p.8.
  7. Mr. Morrow: And, your Honor, we would object to that...
  The court: That's a factual issue for the jury to determine. I will give the standard with regard to failure to warn, whatever that is, and failure to warn will encompass, because that's what the case is about. I mean that's a discussion about the issue, but the issue is failure to warn and we are going to keep it confined to that. And you will argue it's not a shared responsibility, and that's for the jury to determine.
N.T. 11/14/2013 pm, at p.152.

from those applicable to generic drug manufacturers. And different federal statutes and regulations may, as here, lead to different pre-emption results. *Id. Pliva. Inc.*, involved generic drugs and not brand name drugs, such as Topamax. *PLIVA, Inc.* actually further proves this court's ruling because it shows that appellant was held to a higher regulatory standard than manufacturers of generic drugs and that preemption would apply differently because of this disparity. Thus, it has been shown the regulations that apply to appellant are not the same as those for generic drug manufacturers and will affect a preemption claim. Again, appellant's failure to warn is the issue in this case and not preemption.

Hence, based on the evidence and relevant law this court did not manifestly abuse its discretion or apply the law erroneously. Therefore, a new trial or in the alternative JNOV, are not warranted because preemption does not apply in this matter.

2. Plaintiff's Medical Records Were Properly Excluded

Appellant claims this court erred in excluding plaintiff's medical records. This court disagrees. The decision of whether or not to admit evidence is committed to the sound discretion of the trial court and will only be reversed upon a showing that the trial court clearly abused its discretion in admitting evidence. *See Commonwealth v. Kennedy*, 959 A.2d 916, 923 (Pa. 2008). "An abuse of discretion is not merely an error in judgment, but an 'overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence or the record.'" *Commonwealth v. Flamer*, 53 A.3d 82, 86 (Pa. Super. 2012) (citation omitted).

In this case, there were portions of plaintiff's medical

record that were referenced by plaintiff's prescribing physician, Dr. Warner, for purposes of supporting his testimony and to confirm the documentation of treatment related to the ingestion of Topamax. However, the appellant wanted this court to admit portions of plaintiff's medical record that could only be elicited from plaintiff's gynecologist, Dr. Gentry. Dr. Gentry did not testify at this trial and appellant questioned the plaintiff during cross-examination as to the context of her medical record as completed by Dr. Gentry.[8] This court sustained plaintiff's objection because the medical record could not be admitted, as it was hearsay. Furthermore, this court advised appellant in order to admit the medical record from Dr. Gentry's consultation with plaintiff, appellant would have to have Dr. Gentry, as plaintiff's treating gynecologist, testify at this trial.[9]

In addition, this court ruled plaintiff's medical record as inadmissible when appellant attempted to question Dr. Noebels on an irrelevant medical document that a genetic counselor generated. The appellant questioned Dr. Noebels regarding a consultation between a genetic counselor at the Greenwood Genetics Center and plaintiff that took place after Brayden Gurley was born.[10] The appellant attempted to delve into medical records regarding post-birth matters and advice provided to plaintiff that any pregnancy after Brayden Gurley would be an at-risk birth for cleft lip.

---

8. N.T. 11/8/2013 am, p. 83.
9. N.T. 11/8/2013 am, p. 84-85.
10. This court granted (subject to evidentiary rulings) plaintiff's motion in limine that there would be no evidence presented before the jury regarding any injections of medication or other children post-birth of Brayden Gurley. This court ruled that all evidence would focus on Brayden Gurley and medications taken by his mother prior to his birth. *See* plaintiff's motion in limine to exclude any evidence, argument and/or references regarding medications after the birth of son, and other pregnancies — control number 13060189

This court was interested in having evidence presented to the jury that would assist in deciding whether there was a failure to warn by appellant which was the proximate cause of Brayden Gurley's injuries, which were the issues in this case.[11]

It is obvious from the record of this trial that this court did not abuse its discretion in excluding portions of plaintiff's medical record. It is clear that this court objected to the admittance of appellant's evidence because it was hearsay and the appropriate expert witnesses were unavailable to testify as to the context of the medical record at trial. Therefore, this court's judgment on this issue was not a misapplication of relevant law, manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality. Thus, appellant's claim is without merit and does not warrant a new trial.

### 3. Comparative Negligence Does Not Apply

Appellant claims this court erred by not instructing the jury on the comparative negligence and allowing them to "determine what percentage of negligence is attributable to plaintiffs." *See* def. post-trial mot. At 42-43. This court disagrees with appellant's contention. Under the "learned intermediary doctrine" manufacturer of a prescription drug must direct warnings to prescribing physician, but not to the patient. *Taurino v. Ellen*, 397 Pa. Super. 50, 579 A.2d 925 (1990). The warnings which must accompany such drugs are directed to the physician rather than to the patient-consumer as "[i]t is for the prescribing physician to use his independent medical judgment, taking into account the data supplied to him from the manufacturer, other medical literature, and any other sources available

---

11. N.T. 11/4/2013 pm, p. 110 -113.

to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug." *Id.* (quoting *Leibowitz v. Ortho Pharmaceutical Corporation*, 224 Pa. Super. [418] at 431, 307 A.2d [449] at 457(1973)).

Here, the court instructed the jury on the applicable law. Since, this case was based on appellant's failure to warn the prescribing physician, comparative negligence was not applicable. Under the learned intermediary doctrine appellant owed a duty to the prescribing physician, Dr. Warner, not to the plaintiff. Therefore, appellant would have to direct any comparative negligence claim to Dr. Warner as plaintiff's prescribing physician. The jury verdict determined appellant failed in warning Dr. Warner of risks associated with Topamax. The learned intermediary is to the prescribing physician; the appellant had the duty to Dr. Warner to warn of any risks associated with Topamax.[12] Furthermore, it was unnecessary to instruct the jury on the comparative negligence standard because the plaintiff's negligence was not at issue in this case. Therefore, appellant's claim is without merit and does not warrant a new trial.

B. Whether Plaintiffs Established That Appellant's Negligent Failure To Warn Was The Cause Of Brayden Gurley's Injuries

Plaintiff established appellant's negligent failure to warn was the proximate cause of Brayden Gurley's injuries. Appellant claims plaintiff did not prove causation at trial. Under Pennsylvania law, in order for a plaintiff to state a claim for negligence under a failure-to-warn theory, he must show: (1) that the manufacturer owed a

---

12. N.T. 11/14/2013 am, p.124-125.

duty to the plaintiff; (2) that the manufacturer breached that duty; and (3) such breach was the proximate cause of plaintiff's injuries. *Salvio v. Amgen, Inc.*, 810 F. Supp. 2d 745 (W.D. Pa. 2011). Further, in a negligence claim based upon failure to warn, the plaintiff must prove that the manufacturer was at fault. *Bergstresser v. Bristol-Myers Squibb Co.*, CIV.A. 3:12-1464, 2013 WL 1760525 (M.D. Pa. Apr. 24, 2013). This court reiterated these elements in its charge and jury instructions and believes appellant's claims as to causation are without merit.[13] Evidence was presented by both appellant and plaintiff at trial. However, it was the plaintiff's burden to prove the elements at issue by a preponderance of the evidence. Throughout a three-week trial the jury was presented with both physical and testimonial evidence and returned a verdict in favor of the plaintiff. The element of causation was one for the jury to decide and they decided appellant was the cause of plaintiff's injuries. Yet, appellant argues they are entitled to a new trial based on: (1) the knowledge and testimony at trial of Dr. Warner, plaintiff's prescribing physician, and (2) an alleged erroneous jury instruction on proximate causation.

### 1. Dr. Warner's Testimony Did Establish Causation

Dr. Warner provided evidence and testimony at this trial that established causation. Appellant claims they are entitled to a new trial because Dr. Warner was unable to

---

13. The court provided the appropriate charge to the jury as to the issues in this case.

The court: The issues for you to decide in accordance with the law as I give it to you are, one, was Janssen Pharmaceuticals. Inc. negligent? Second, was Janssen Pharmaceutical's negligent conduct a proximate cause in bringing about Brayden Gurley's harm? Third, plaintiffs also have the burden of proving the extent of damages caused by the defendant, Janssen Pharmaceuticals, Inc.

N.T. 11/15/2013 pm, P. 22-23.

establish causation. As an initial matter, appellant claims the jury was not instructed as to which physician they owed a duty. Throughout trial and in the jury instructions it was noted appellant owed a duty to plaintiff's prescribing physician, Dr. Warner. Also, appellant claims this court erred in admitting Dr. Warner's testimony. First, appellant claims there was no testimony that indicated had Dr. Warner known of the potential risks of Topamax that he changed the prescription for Ms. Powell. On the contrary, Dr. Warner testified at trial had he known about the potential risks associated with Topamax it would have impacted his decision on prescribing the medication to plaintiff. Also, in the past when Dr. Warner was aware of risks of teratogens he informed Ms. Powell of these risks. Specifically, Dr. Warner told Ms. Powell that Depakote had known risks of teratogenicity associated with it. Dr. Warner confirmed had he known of any teratogen risk associated with Topamax at the time he prescribed it to Ms. Powell, he would have informed her of them as he had done in the past with Depakote.[14]

Second, appellant claims Dr. Warner had independent knowledge of potential birth defects when he prescribed Topamax to Ms. Powell in 2006. However, testimony in Dr. Warner's videotaped deposition completely contradicts appellant's argument on Dr. Warner's knowledge. Dr. Warner specifically testified he had no knowledge of the

---

14. Q: If Topamax had been a pregnancy category D when you first prescribed it to Haley in March of 2006, would that have altered your prescribing habits?
A: Likely so, yes.
Q: How would that have altered your prescribing habits?
A: Well, I would have considered it a medication like Depakote, which would have been a good choice for her epilepsy from the beginning, but not a good choice for her because of potential for pregnancy.
Dr. Warner Dep. 75:21 -76:11, July 30, 2012.

increased risks for cleft lip or cleft palate that could result from the ingestion of Topamax by a pregnant woman.[15] Third, appellant argues Dr. Warner did not prescribe the Topamax that Ms. Powell ingested when she became pregnant. Dr. Warner prescribed Topamax to Ms. Powell on March 27, 2006 after completing a risk/benefit analysis.[16] Dr. Warner testified on November 28, 2007, after finding out Ms. Powell was pregnant, he advised Ms. Powell to taper off of Topamax.[17] Additionally, Dr. Warner testified he had no reason to believe Ms. Powell stopped taking Topamax prior to November 28, 2007, and believed she had continuously been on Topamax since he prescribed the medication to her.[18] At trial appellant attempted to prove Dr. Warner had no knowledge whether Ms. Powell was continuously on Topamax, and that Dr. Warner was not the physician that prescribed the Topamax to Ms. Powell while she was pregnant. Nonetheless, throughout Dr. Warner's testimony plaintiff's medical record was repeatedly referenced because Dr. Warner documented plaintiff's status at each scheduled visit.[19] Plaintiff's medical record clearly showed the plaintiff was taking Topamax as Dr. Warner had prescribed it to her, from April 2006 until plaintiff notified Dr. Warner of her pregnancy.[20] It is apparent by the verdict the jury decided to believe the testimony provided by Dr. Warner.

Lastly, appellant claims there was no evidence to show

15. Q: Did you have any knowledge in March of 2006 of Topamax putting a patient at an increased risk for cleft lip or cleft palate, more specifically, the unborn child at risk for cleft lip or cleft palate? A: No.
Dr. Warner Dep. 49:17-49:24, July 30, 2012.
16. *See* Dr. Warner Dep. 48:13 — 48:24, July 30, 2012.
17. *See* Dr. Warner Dep. 63:02 — 63:09, July 30, 2012.
18. *See* Dr. Warner Dep. 64:23 — 65:013, July 30, 2012.
19. *See* Dr. Warner Dep. 64:23 — 65:013, July 30, 2012
20. *Id.*

Dr. Warner ever relied on the Topamax label when deciding to prescribe the medication to Ms. Powell. At the time Dr. Warner prescribed Topamax to plaintiff it was categorized as a Pregnancy Category C drug. Dr. Warner testified he needed as much information as possible to appropriately inform patients of risks that may exist with medications.[21] Moreover, Dr. Warner stated he expected the information provided in the PDR to be accurate and the manufacturer of medication to fully inform as to the risks through the PDR.[22]

Dr. Warner prescribed Topamax to the plaintiff based on the information he had on March 27, 2006. Dr. Warner's testimony reveals he was not aware of any risks associated with Topamax at that time and did not inform plaintiff of risks associated with cleft lip or cleft palate. There was a plethora of evidence and testimony presented at trial that suggested the inadequacy of the Topamax label and how the label's contents influenced the decision of the prescribing physician, Dr. Warner, when he prescribed Topamax to the plaintiff. Consequently, the jury made its decision based on the abundance of evidence presented and found appellant's failure to warn to be the proximate cause in bringing upon Brayden Gurley's harm.[23] For these reasons appellant's claims as to Dr. Warner's testimony are without merit and do not warrant a new trial.

2. The Court Provided An Accurate Jury Instruction On Proximate Causation

Appellant is not entitled to a new trial because this court

---

21. *See* Dr. Warner Dep. 60:24 — 61:11, July 30, 2012.

22. *See* Dr. Warner Pep. 13:11-14:06, July 30, 2012.

23. Question number two on the verdict sheet: Was defendant Janssen Pharmaceutical Inc.'s negligence the proximate cause in bringing about Brayden Gurley's harm?
Jury answer: Yes

did not err in providing proper instructions to the jury as to proximate causation. Where accuracy of the charge is an issue on appeal, appellate court must review it, not to determine whether certain portions taken out of context appear erroneous, but whether charge in its entirety, against the background of the evidence, demonstrates that error was committed which was prejudicial to the complaining party. *Brandimarti v. Caterpillar Tractor Co.*, 364 Pa. Super. 26, 527 A.2d 134 (1987). The trial judge has wide latitude in his choice of language when charging the jury, provided that the judge fully and adequately conveys the applicable law. *Fragale v. Brigham*, 741 A.2d 788 (Pa. Super. Ct. 1999). Appellate court will not grant a new trial because of an erroneous jury instruction unless the jury charge in its entirety was unclear, inadequate, or tended to mislead or confuse the jury. *Id.*

Here, the trial judge appropriately charged the jury on proximate causation based on the facts in this case. Furthermore, appellant and plaintiff agreed to the charge on proximate causation based on South Carolina law during the charging conference.[24] There was no indication or evidence that the instruction to the jury on proximate cause in any way prejudiced appellant. However, this court feels it is necessary to reiterate the agreed upon jury charge given on proximate causation at this trial:

> I'll now define for you proximate cause. Proximate cause means the efficient cause, the direct cause, the cause without which the injury and damage would not have occurred. If you find the plaintiffs have proved the defendant was negligent but have failed to prove that such negligence was a proximate cause of the injury and damage, the plaintiffs will have failed to make out a

---

24. N.T. 11/14/2013 pm, p. 113-115, 127.

case and you would be required to bring in a verdict for the defendant. However, if the plaintiffs have proved these two propositions, that is, that the defendant was negligent and that such negligence was the proximate cause of plaintiff's injury and damages, then you would go to the third, in this case, the fourth step, which is damages. Negligence is not actionable unless it is a proximate cause of the loss or damages complained of. It may be deemed a proximate cause only when, without such negligence, the loss or damage would not have occurred or could have been avoided. Proximate cause requires proof of both causation and fact and legal cause. Causation and fact is proved by establishing the plaintiff's injuries would not have occurred but for the defendant's negligence. Legal cause is proved by establishing foreseeability.

The touchstone of proximate cause is foreseeability, that is, foreseeability of some injury from a negligent act or omission is a prerequisite to it being a proximate cause of the injury for which recovery is sought. The test of foreseeability is whether some injury to another is the natural and probable consequence of the complained of act. The defendant may be held liable for anything which appears to have been a natural and probable consequence of his or her negligence. For an act to be a proximate cause of the injury, the injury must be a foreseeability consequence of the act.

Foreseeability is not determined from hindsight but rather from the defendant's perspective at the time of the complained of act. The law requires only reasonable foresight. When the injury complained of is reasonably foreseeable in the exercise of due care, there's no liability. It is not necessary for a plaintiff to

demonstrate the defendant should have foreseen the particular event which occurred, but merely that the defendant should have foreseen his negligence would probably cause injury to someone. Negligent conduct is the proximate cause of injury if that injury is within the scope of the foreseeable risk of negligence.

While it is not necessary that the defendant must have contemplated or could have anticipated the particular event that occurred, liability cannot rest on mere possibilities. The defendant cannot be charged with that which is unpredictable or that which could not have been expected to happen. A plaintiff, therefore, proves legal cause by establishing the injury in question occurred as a natural and probable consequence of the defendant's negligence. In determining whether a consequence is one that is natural and probable, the defendant's conduct must be viewed in light of the attendant circumstances. Proximate cause does not mean the sole cause. The defendant's conduct can be a proximate cause if it was at least one of the direct concurring causes of the injury. The law defines proximate cause of an injury to be something that produces a natural chain of events, which, in the end, brings about the injury. In other words, proximate cause is direct cause without which the injury would not have occurred.

Causation based upon a possibility rather than a probability is not sufficient for a plaintiff to recover in a negligence case. If the event would have happened as a natural and probable consequence, even in the absence of the alleged breach, then the plaintiff has failed to demonstrate proximate cause. Further, where the cause of plaintiffs injury may be as reasonably attributed to an act for which the defendant is not liable as to one for

which the defendant is liable, the plaintiff has failed to carry the burden of establishing that plaintiff's injuries were the proximate result of the defendant's negligence. If you should find that the plaintiffs have established the defendant's negligence was a proximate cause of the injury or damage complained of and that such defendant has failed to establish an adequate defense, then you should return a verdict for the plaintiff on plaintiff's negligence theory. If, on the other hand, you should find that the plaintiffs have failed to establish, one, that the defendant was negligent; and two, that this negligence was a proximate cause of the injury complained of, then you must find for the defendant as to this theory of liability.

N.T. 11/15/2013 pm, at p.34-39. This court clearly provided the jury with an extensive explanation on the applicable South Carolina law related to proximate causation. Looking at the proximate causation jury instruction in its entirety there is no evidence that it was unclear, inadequate, or tended to mislead or confuse the jury. Thus, this court's charge was not an erroneous statement of the law and did not prejudice appellant in any way that would warrant a new trial. Therefore, appellant's claims are without merit.

3. Plaintiffs' Claim is Barred by the Pennsylvania Two-Year statute of Limitations

Appellant claims this court erred in denying their motion for summary judgment because plaintiffs are barred by Pennsylvania's two-year statute of limitations from making individual claims for pecuniary loss/medical expenses.[25] Any party may move for summary judgment

25. The period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Common-

in whole or in part as a matter of law whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report. Pa. R. Civ. P. 1035.2(a). In this case judge Arnold New denied appellant's motion for summary judgment because there was a genuine issue of fact as to when the plaintiff knew or should have known of her injuries.[26] As plaintiffs filed their complaint on May 19, 2011, their claim is only time-barred if it is clear they had notice of their claims against Janssen before May 19, 2009. Additionally, appellant claims the latest date that plaintiffs could have known that Topamax was the cause of their injuries was on July 7, 2008, the day Brayden Gurley was born. Therefore, judge New's denial of appellant's motion for summary judgment was appropriate considering there was a genuine issue of material fact still in dispute. Accordingly, judge New was guided by established law in *Coleman v. Wyeth Pharmaceuticals Inc.* in making his decision and decided the jury as the fact finder should determine this issue at trial.[27]

Subsequently, this court denied appellant's motion for directed verdict on this same issue. Appellant disagrees with this judgment. When determining whether to grant a

---

wealth, whichever first bars the claim." 42 Pa.S.C. § 5521(b).

26. *See* control number 13040566 — Defendant's motion for dummary judgment

27. In *Coleman v. Wyeth Pharmaceuticals, Inc.*, the Superior Court of Pennsylvania held that, in the context of pharmaceutical liability claims, where there are factual and credibility determinations to be made regarding the plaintiff's reasonable diligence for purposes of application of the discovery rule to toll statute of limitations, the issue should be submitted to the finder of fact.[27] Where the record raises a genuine issue of material fact as to when the plaintiff knew or should have known her injuries were caused by her ingestion of the defendant's drug, summary judgment should be denied. *Coleman v. Wyeth Pharm., Inc.*, 2010 PA Super 158,6 A.3d 502 (Pa. Super. Ct 2010).

directed verdict, the trial court must consider the facts in the light most favorable to the nonmoving party and must accept as true all evidence which supports that party's contention and reject all adverse testimony. *Faherty v. Gracias*, 2005 PA Super 174, 874 A.2d 1239 (Pa. Super. Ct. 2005). At trial, plaintiff testified that she did not become aware that Topamax could possibly be the cause of Brayden Gurley's injuries until after he was born, in 2011. Plaintiff testified her mother-in-law made her aware that Topamax could possibly be the cause of Brayden Gurley's cleft lip after seeing a commercial on the television.[28] On the other hand, appellant through various witnesses claimed the first time plaintiff became aware of the cause of Brayden Gurley's injuries was on July 7. 2008. There was a discrepancy in testimony as to when plaintiff became aware of the cause of their injuries. This court viewing all the evidence in the light most favorable to plaintiff, as the nonmoving party, denied appellant's motion for directed verdict. Therefore, the issue as to whether the PA two-year statute of limitations applied was a question for the jury to decide.

Finally, appellant claims this court erred in denying their motion for JNOV. As discussed above, the appellate court will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when the appellate court finds an abuse of discretion or an error of law that controlled the outcome of the case. *Campisi v. Acme Markets, Inc.*, 2006 PA Super 368, 915 A.2d 117 (Pa. Super. Ct. 2006). Here, it is clear that there was no error in law or abuse of discretion. Throughout the litigation of this matter there has been a genuine issue as to when plaintiffs became aware of their injuries. Accordingly,

---

28. *See* N.T. 11/8/2013 pm, at p. 53.

both judge New and this court denied appellant's motions for summary judgment and directed verdict, respectively, because the fact finder needed to determine when Plaintiff parents became aware of the cause of their injuries. Hence, the jury as the fact finder decided based on the testimony presented at trial that the Pennsylvania two-year statute of limitations did not apply. Therefore, appellant's claims are without merit.

D. Whether This Court Erred In Its Evidentiary Rulings At Trial

Appellant claims this court erred in making various evidentiary rulings. These claims are without merit. The function of the trial court in determining whether to exclude relevant evidence on the basis that its probative value is outweighed by its prejudicial effect is to balance the alleged prejudicial effect of the evidence against its probative value, and it is not for appellate court to usurp that function. *Lykes v. Yates*, 2013 PA Super 258, 77 A.3d 27 (Pa. Super. Ct. 2013). On appeals challenging an evidentiary ruling of the trial court, the Superior Court's standard of review is limited; a trial court's decision will not be reversed absent a clear abuse of discretion. *Com. v. Aikens*, 2010 PA Super 29, 990 A.2d 1181 (Pa. Super. Ct. 2010). An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion; rather, an abuse of discretion requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. *Com. v. Dengler*, 586 Pa. 54, 890 A.2d 372 (2005). Appellant's claims on the evidentiary rulings will be addressed in turn.

1. The Consent Forms Were Admissable

Appellant claims admission of the informed consent

forms and related testimony warrant a new trial because they were irrelevant and prejudicial. Appellant's claims are without merit. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 401. 4. Furthermore, the exclusionary rule in Pa. R.E. 403 "is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *Com. v. Broaster*, 863 A.2d 588, 592 (Pa. Super. 2004), *app. denied*, 876 A.2d 392 (Pa. 2005).

In this case, the informed consent forms provided to clinical trial participants contained information regarding birth defect warnings to Topamax users.[29] Accordingly, the data from the consent forms made it more probable that appellant had knowledge that Topamax could cause birth defects in its users and that information was directly related to how the trier of fact determined this matter. The consent forms could not be said to be prejudicial to appellant as they only assisted the jury in making a

---

29. Dr. Ford confirmed appellant had knowledge of Topamax causing birth defects in individuals prior to 2007 in the consent forms. If appellant had communicated the same information in the consent form to the FDA, physicians would have an updated PDR.

Q: Very quickly. Back in 1997, before any 2000 e-mail that you were referring to earlier by the FDA, Janssen on its own was telling study participants that topiramate and value at any rate have the potential for causing serious birth defects in off spring, do you see that there?
A: I see that, yes. N.T. 11/12/2013 pm, atp.15.

....

Q: Would you agree with me that for purposes of prescribing physicians, the fastest and best way to get them information of safety profile of the medication is through the PDR?
A: Yes
Q: And if the PDR is incorrect, they don't have all the information. Is that fair?
A: Yes, I guess so. N.T. 11/12/2013 pm, at p. 19.

decision based on facts relevant to this case.

Similarly, all related testimony by Dr. Pence, Caryn Kurland and Cathy Ellis was relevant as well. Their testimony assisted the trier fact in understanding the language of the form and provided confirmation that the same information available in the consent forms in 2000 was not available to physicians prescribing Topamax.[30] This information was relevant because it further suggested appellant's prior knowledge of the risks of Topamax for patients in their child bearing years. Therefore, the consent forms were admissible based on their relevance to this case.

2. The AER's Data Was Relevant and Not Prejudicial to Appellant

Appellant was not prejudiced by the admittance of adverse event reports because the reports were relevant and germane to the issue of causation in this case. Additionally, appellant argues that expert testimony by both Dr. Pence and Michael Kaufman should have been excluded because they relied on AER's to testify. However, expert testimony that relies, in part, on case reports to establish causation would not go against the *Frye* test for admissibility of novel scientific evidence because the court has applied a reasonably broad meaning to the term "novel." *Betz v. Pneumo Abex, LLC*, 615 Pa. 504, 44 A.3d 27 (2012). The court reiterates its conclusion that, because plaintiffs experts "did not *solely rely on case reports* in forming their opinions on causation but used them to supplement their extensive review" of other evidence, such testimony is admissible. *Wolfe v. McNeil-PPC, Inc.*, CIV.A. 07-348, 2012 WL 38694 (E.D. Pa. Jan. 9, 2012). (emphasis added).

30. N.T. 10/29/2013 am, p.55-58.

First, if complex and technical medical reports are presented with an expert whose testimony would explain their significance to the jury, the evidence should be admitted. *McDaniel v. Merck, Sharp & Dohme*, 367 Pa. Super. 600, 533 A.2d 436 (1987). Dr. Pence testified as to the need and purpose of adverse event reports in order for the jury to understand their relevance to the issue in this case.[31] Second, Dr. Pence testified her knowledge was not solely based on adverse event reports, AER's are only one source for the medical community to keep watch [of effects] once the medication is marketed to the public. Dr. Pence also stated animal studies, the Marrow publication of 2005 and spontaneous reports made by individuals that experience adverse reactions to drugs and inform the manufacturer assisted in forming her testimony.[32] Dr. Pence testified besides adverse event reports, the data retrieved from scientific and medical literature from ongoing clinical studies assist in forming a causal connection between the product and side effects in users.[33] Dr. Pence not only based her testimony on reports, scientific literature and studies but also was guided by evidence presented by appellant.[34] Dr. Pence testified regarding information contained in the AER's to show appellant had notice of birth defects prior to 2007 and that there was a possible connection between birth defects and Topamax usage during pregnancy. This is relevant to the issue of knowledge and the duty to warn in this case.

Likewise, Michael Kaufman based his testimony regarding countless reports and independent studies completed by appellent, not solely AER's. Mr. Kaufman

31. N.T. 10/29/2013 pm, p.60.
32. N.T. 10/29/2013 pm, at p.12, 68-69.
33. N.T. 10/29/2013 am, at p.59-60.
34. N.T. 10/29/2013 am, at p.56-58

testified to appellant's knowledge of congenital abnormalities, in the form of four hypospadias cases, which were reported to appellant two years after Topamax was put on the market. This prompted appellant to change their label. In stark contrast, after receiving adverse event reports of craniofacial and/or skeletal defects, there was no change to appellant's label.[35] Mr. Kaufman also testified appellant had notice through their own adverse event reports of birth defects in individuals that used Topamax.[36]

Although, the maladies may not be the same, the inference could have been made by the jury that it was more probable Topamax was the cause of these defects. It was up to the jury on how they chose to apply the testimony of each witness. Neither witness used only the AER's to form their opinions and were informed by a variety of studies, reports and evidence. Hence, both Dr. Pence and Michael Kaufman based a part of their testimonial findings on AER's but it was only needed to show appellant was on notice that Topamax could possibly cause the birth defects in its users at issue in this case. Therefore, a new trial is not warranted because the AER's were admissible, not prejudicial and not the only form of evidence the witnesses based their testimony on.

3. Admittance of Evidence Post Dating Ms. Powell's Conception Was Relevant

This court did not err in admitting testimony having to do with post-conception literature. Appellant is correct

---

35. Michael Kauffman Dep. 149:21 — 150:07, November 13, 2013.
36. Q: All right. So if we look back at this settlement, there are no prospective reports of congenital malformations in which topiramate was the only AED reportedly described, while accurate, your company had seven reports where Topamax was the only AED prescribed where birth defects were noted, true?
A: That's what the report says. Michael Kauffman Dep. 193:11 — 193:20, November 13, 2013.

in stating this court ruled all post-conception evidence was inadmissible. However, the information that Edward Osifchin was allowed to testify to only addressed issues prior to conception and all information having to do with matters post-conception were redacted. In this case, testimony by Mr. Osifchin referenced the Morrow study but did not reference information regarding the Topamax label in 2008 as the appellant attempted to suggest at trial.[37] Additionally, plaintiff's counsel removed all information regarding the 2008 label from the clip of Mr. Osifchin's video testimony. The witness simply acknowledged there was a study generated and did not go into any further explanation, which is why this court overruled appellant's objection to admit this witness's testimony.[38]

Likewise, appellant objected to testimony by David Biondi because documents he referenced at trial were related to post-conception communications.[39] The document at issue was a 2008 email correspondence. Mr. Biondi referenced this email but focused on the attachments which referenced pertinent information from 1997 through November 2007 regarding the issues in this case. This court specifically ruled that no information post-conception could be referenced and the appellant had failed in directing the court to any communication post-conception. As this court ruled at trial, "the date of the report is not controlling, it is the information in the report."[40] Since, appellant did not provide any evidence to this court that showed the witness was relying on post-conception communications to testify, appellant's objection was overruled. Thus, appellant's claims as to

37. N.T. 10/31/13 am, p. 9-11.
38. N.T. 10/31/13 am, p. 11.
39. N.T. 10/31/13 am, p. 20-21.
40. N.T. 10/31/13 am, p. 26.

admittance of literature having to do with post-conception are without merit and do not warrant a new trial.

4. Testimony by Dr. Finnell and Dr. Jeffrey Noebels Was Admissible

Appellant claims they are entitled to a new trial because Dr. Finnel and Dr. Noebels testimony should be considered as cumulative expert testimony as well as novel science. This court disagrees with appellants assertions. Evidence may be excluded if its probative value is outweighed by the "needless presentation of cumulative evidence." Pa.R.E. 403. Cumulative evidence is defined as "additional evidence of the same character as existing evidence and that supports a fact established by the existing evidence." *Commonwealth v. G.D.M.*, Sr., 926 A.2d 984, 989 (Pa. Super. 2007) (quoting Black's Law Dictionary, Seventh Edition, at 577), *appeal denied*, 596 Pa. 715, 944 A.2d 756 (2008). However, while their [Dr. Finnel and Dr. Noebels] testimony may have been corroborative, it was not needlessly cumulative. *See Commonwealth v. Flamer*, 53 A.3d 82, 88 n.6 (Pa. Super. 2012) ("Evidence that strengthens or bolsters existing evidence is corroborative evidence; we have previously explained that corroborative evidence is not cumulative evidence."), citing *Commonwealth v. G.D.M.*, Sr., 926 A.2d 984, 989 (Pa. Super. 2007).

Dr. Finnel is the director of Genomic Medicine at Dell's Children's Medical Center and a tenured professor in the Department of Nutritional Sciences, Chemistry, and Biochemistry at the University of Texas at Austin. He is a board certified Ph.D medical geneticist whose expertise has been utilized by a variety of academic, government and corporate entities. Dr. Finnel has also consulted pharmaceutical companies in order to assist

with the interpretation of data on the teratogenicity of anti-epileptic drugs. Additionally, Dr. Finnel was hired by Johnson & Johnson's research division in 1999 to look at pregnancy outcomes with topirimate and determine if it was a teratogen.[41] At trial, Dr. Finnel testified as to how Topamax could cause cleft lip with or without cleft palate and walked the jury through slides depicting this information. Dr. Finnel's testimony was based on published reports from the North American Anti-Epileptic Drug Registry, Pregnancy Registry Data, National Birth Defects Prevention Study and various studies that had been completed on mammals.[42] Dr. Finnel testified that it was his opinion after consulting various studies and performing them himself that consistent with previous AED experience, limited topiramate monotherapy data suggests that topirimate may be associated with some teratogenic risk.[43] Moreover, Dr. Finnel testified all the expert testimony he provided at trial was within a reasonable degree of scientific certainty, specifically in the areas of teratogenics embryology.[44]

Dr. Noebels is a Professor of Neurology, Neuroscience, and Molecular and Human Genetics at the Baylor College of medicine in Houston, Texas. Dr. Noebels has twenty years of experience treating women in child-bearing years who suffer from epilepsy, including prescribing anti-epileptic drugs to treat this condition. Dr. Noebels simply testified based on various studies, reports and Dr. Warner's records. Based on Dr. Noebels professional background and review of published reports, he determined that Topamax was prescribed to plaintiff in her first trimester

---

41. N.T. November 6, 2013 pm. p. 5.
42. N.T. November 6, 2013 am, p. 50-56.
43. N.T. 11/6/2013 pm, P. 32.
44. *Id.* at 34.

and was the cause of Brayden Gurley's cleft lip.[45]

Here, the testimony by each doctor shows they each provided a different perspective based on their diverse professional backgrounds. Each expert witness testified about the issue in this case based on their individual expertise and merely strengthened the other expert's testimony. Neither Dr. Finnel nor Dr. Noebels presented evidence that was needlessly cumulative; both provided varying opinions that assisted the jury, as the trier of fact, in determining the outcome of this case. Throughout the trial and during the instructions the jury was reminded that they would weigh the evidence presented at trial to the best of their ability.[46] In this case, the jury was presented with the task of weighing the testimonial evidence presented by Dr. Finnel and Dr. Noebels. Equally important, the jury needed to weigh the evidence presented by appellant's witnesses. Dr. Nye testified at trial regarding appellant's knowledge and failure to warn. Dr. Nye asserted appellant had no notice of cluster data related to cleft lip or palate and did not fail to warn physicians, as it was not appellant's practice to modify their label each time an adverse event report was received.[47] In spite of appellant's witness testimony the jury decided to believe Dr. Finnel and Dr. Noebel's testimony.

Also, appellant claims they are entitled to a new trial because Dr. Finnel and Dr. Noebels testimony should be considered to be novel science. Yet, to be "novel" the

---

45. N.T. 11/4/13 pm, p. 17.

46. The court: You have to decide what you believe, who you believe was telling the truth, the weight to give the evidence. As I told you when we started, your principle tool in deciding credibility is your life experience and common sense. When judging witnesses, weigh the testimony of each witness and give it the weight that, in your judgment, it is fairly entitled to receive. N.T. 11/15/2013, pm, p. 18.

47. N.T. 11/14/2013 pm, p. 18, 30-31.

methodology (or its application) "must be something different from 'new,' which could be original, striking, unusual or strange." *Dengler*, 843 A.2d at 1243. So long as the proffered evidence is considered by the court to stem from scientific research which has been conducted in a fashion that is "generally recognized as being sound" within the relevant scientific community, rather than "the fanciful creation of a renegade researcher," then it will be "generally accepted." *M.C.M. v. Milton S. Hershey Medical Center*, 834 A.2d 1155, 1158-59 (Pa. Super. 2003).

As stated above, Dr. Finnel testified that one way he retrieved information on topirimate being a teratogen was by performing animal studies because mammals share similar biology.[48] Dr. Finnel also testified in order to formulate his opinion in this case, and as his primary methodology, he gathered all the clinical and scientific evidence that he could and reviewed it.[49] Additionally, Dr. Noebels testified that he believed Topamax caused Brayden Gurley's cleft lip and based his expert opinion on published articles and Dr. Warner's records. Dr. Noebel's opinion was not created on his own; he relied on the Morrow Study as well as other large scale studies to reach his conclusion. Neither doctors' methodology can hardly be described as novel; it is not unusual, new or strange. The methodology applied by each doctor was sound and generally followed accepted research practices used within the relevant scientific community. Appellant failed to prove otherwise. Thus, appellant has not shown that the methodologies employed by Drs. Finnell and Noebels were novel or were applied in a conventionally unsound manner. Appellant's assertions instead go to the weight

48. N.T. 11/6/2013 am, p. 53.
49. N.T. 11/4/2013 pm, p. 19.

of the evidence, which the jury considered in reaching its verdict. Therefore, appellant should not be entitled to a new trial.

E. Whether Appellant is Entitled to Remittitur.

Appellant is not entitled to remittitur. In determining whether a defendant is entitled to remittitur of a damages award, the question is whether the award falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption. *Potochnick v. Perry*, 2004 PA Super 393, 861 A.2d 277 (Pa. Super. Ct. 2004). Merely because a verdict is large does not necessarily mean it is excessive. *See Tindall v. Friedman*, 970 A.2d 1159,1177 (Pa. Super. 2009). The decision to grant or deny remittitur is within the sole discretion of the trial court. *Potochnick*, PA Super at 861.

This court did not find that the verdict was excessive or shocking to the conscience given the evidence and issues in this case. In addition, it should be noted that the jury based their verdict on evidence presented by both appellant and plaintiff throughout the trial. The jury heard testimony from various physicians that testified to Brayden Gurley's injuries and accompanying treatments that would be needed to correct those injuries. The jury also heard testimony from Brayden Gurley's stay-at-home mother who is responsible for his care. Brayden Gurley's mother testified how the surgery for his severe cleft lip has negatively affected his self-esteem, confidence and his ability to have a simple conversation with others. Brayden Gurley's mother also stated that her son becomes extremely frustrated when people do not understand him and suffers from embarrassment due to the residual scar from his

cleft lip surgery. Additionally, physicians' testimony as to Brayden Gurley's injuries included; ongoing visits with a plastic surgeon, dental surgery, speech therapy, auditory evaluations, oral surgery, possible rhinoplasty and treatment for possible psychological issues related to these various corrective surgeries. Given the injuries that will plague Brayden Gurley into adulthood, the award determined by the jury can hardly be said to be excessive.

This verdict does not shock this court's sense of justice nor does it demonstrate the jury was influenced by partiality, prejudice, mistake or corruption. Rather, this verdict shows the jury made an informed and educated finding based on the facts and evidence presented at trial. Brayden Gurley's pain, suffering and loss were significant and demonstrated on the record throughout the trial. Hence, the jury decided on a just and fair award to compensate Brayden Gurley for his injuries. Therefore, appellants' claims are without merit.

## CONCLUSION

The court's order dated December 3, 2013, denying appellant's post-trial motion should be affirmed.