**Joan CAMPO, Executrix of the Estate of Tarcisco Campo, Appellee,**

v.

**ST. LUKE'S HOSPITAL and David Schwendeman, M.D.**

**Appeal of St. Luke's Hospital.**

Superior Court of Pennsylvania.

Argued Feb. 23, 2000.
Filed May 24, 2000.
Reargument Denied July 28, 2000.

Allan H. Starr, Philadelphia, for appellant.

Clifford E. Haines, Philadelphia, for appellee.

Before McEWEN, President Judge, HUDOCK, J., and CIRILLO, President Judge Emeritus.

CIRILLO, President Judge Emeritus.

¶ 1 St. Luke's Hospital appeals from an order entered in the Court of Common Pleas of Lehigh County.[1] We reverse.

¶ 2 Tarcisco Campo, M.D., was a board-certified anesthesiologist who practiced at St. Luke's Hospital (St. Luke's) from 1986 until his death. Like the other members of the Anesthesiology Department, Dr. Campo was an independent contractor; he essentially maintained his own private practice at St. Luke's. Dr. Campo suffered from drug addition; however, he kept his substance abuse well hidden. Dr. Campo was respected by his peers, was well-liked by the staff at St. Luke's, and was not suspected of having a drug-dependency problem. Joseph B. Doto, M.D., the

---

1. In the absence of entry of judgment on the verdict, "we have repeatedly advised the profession that an order refusing a new trial is interlocutory and unappealable," and that such an appeal should not be entertained until a final judgment is entered. *Dennis v. Smith*, 288 Pa.Super. 185, 186, 431 A.2d 350, 351 (1981); *see* Pa.R.A.P. 301. Here, St. Luke's filed a notice of appeal on July 29, 1999. The docket reflects that judgment was entered on the verdict on October 28, 1999. "A notice of appeal filed after the announce-ment of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof." Pa.R.A.P. 905(a). Although the verdict in this case was reduced to judgment after the notice of appeal was filed, the appeal is properly before this court. While the caption indicates that this appeal was taken from the order docketed June 30, 1999 (denying post-trial relief), we shall deem this appeal taken from the October 28, 1999 judgment.

head of the Anesthesiology Department at St. Luke's, had no suspicions of Dr. Campo's drug use. Likewise, Steven A. Carlson, director of the pharmacy at St. Luke's, had no knowledge that Dr. Campo was diverting drugs for his personal use. In fact, during their nine years of marriage, Appellee Joan Campo, wife of Dr. Campo and executrix of his estate, was unaware of her husband's addiction. That changed in May of 1992, when Mrs. Campo found Dr. Campo unconscious on the bathroom floor with a syringe and a small vial containing the remnants of the drug Sufenta by his side. Mrs. Campo immediately contacted Donald Dodson, M.D., a friend and anesthesiologist at St. Luke's, who advised her that while her husband was not in any immediate danger from ingesting Sufenta, he had a problem and needed help. Neither Dr. Campo, Mrs. Campo, nor Dr. Dodson reported this incident to St. Luke's.

¶ 3 Unknown to the hospital, Dr. Campo commenced psychiatric treatment with David Schwendeman, M.D. While Dr. Campo admitted to Dr. Schwendeman that he had a drug problem, neither he nor his wife told the psychiatrist about the May, 1992 incident. Also, Dr. Campo did not reveal to Dr. Schwendeman that he had obtained his drugs from St. Luke's. Based upon a diagnosis of major depression, Dr. Schwendeman prescribed Prozac to Dr. Campo.

¶ 4 According to Mrs. Campo, Dr. Campo appeared to be in a normal, pleasant mood before leaving for work on October 23, 1992. Dr. Campo had four patients scheduled for anesthesiology that day. The doctor obtained from the hospital·four doses, totaling 400 milliliters, of meperidine (Demerol) that morning. Two of the cases were canceled and Dr. Campo did not use the Demerol on the other patients. Dr. Campo did not, however, return the unused doses of Demerol to the hospital. Instead, at approximately 4:00 p.m., Dr. Campo entered the men's bathroom and injected himself with Demerol. The com-bination of the Prozac and Demerol caused Dr. Campo's heart to stop, and his body was discovered later that evening. His death was ruled an accidental drug overdose.

¶ 5 It is important to note that, eight days before Dr. Campo's death, St. Luke's implemented a Controlled Drug Module (CDM) dispensing machine for the distribution of controlled substances. Each anesthesiologist was given a personal identification number to access the machine, and the doctors were authorized to obtain as many medications as needed for patients in a given day. If the physician did not use any of the dose, he or she was required to deposit the drug back into the system. If the doctor used part of a dose, he or she was required to dispose of the remainder. To enforce its anti-diversion procedure, the hospital planned to perform random record checks at the end of each month. Prior to the CDM system, the hospital had in place a Controlled Substance Distribution Record (CSDR) accounting procedure. Specifically, the doctor or nurse was required to record the amount of medications administered, wasted, and/or returned. After completion of the case, the doctor was required to return any unused doses to the Post–Anesthesia Care Unit (PACU), and remnants were to be discarded. The number of cases would then be reported to the Pharmacy Department which would reconcile the amount of drugs dispensed to those used, wasted, or returned. A PACU nurse would obtain inventory from the pharmacy on a daily basis. It is undisputed that both of the hospital's anti-diversion policies were, on their face, compliant with state and federal guidelines.

¶ 6 Following her husband's death, Mrs. Campo commenced a wrongful death and survival action. Mrs. Campo brought a negligence claim against St. Luke's and a medical malpractice claim against Dr. Schwendeman. Primarily, Mrs. Campo asserted that St. Luke's was negligent when it failed to follow its own policies and

procedures adopted to prevent diversion of various controlled substances under the control of its pharmacy; as a direct result thereof, Dr. Campo continuously diverted various controlled substances from the hospital, which eventually led to his death. The case was tried before a jury, the Honorable Edward D. Reibman presiding. The jury returned a verdict against St. Luke's and Dr. Schwendeman and awarded Mrs. Campo $5,600,000.00 in damages. Specifically, the trial court concluded that the hospital had a duty to Dr. Campo created by both statutory law (the Controlled Substance, Drug Device, and Cosmetic Act, 35 P.S. § 780–101), and by its acknowledged responsibility to control its drugs and to protect against physician abuse and impairment. It was determined that the hospital had failed to exercise reasonable care in implementing and enforcing its anti-diversion policies and procedures. The jury apportioned forty-eight percent of the causal negligence to St. Luke's, thirty-eight percent to Dr. Schwendeman,[2] and twenty-two percent comparative negligence to Dr. Campo. The court molded the verdict to $4,368,000.00 to reflect Dr. Campo's proportionate share of liability.

¶ 7 St. Luke's filed a motion for post-trial relief, seeking both judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial based on legal, evidentiary, and instructional rulings of the court. The trial court denied St. Luke's post-trial motion and molded the verdict to include delay damages of $1,313, 937.33. This appeal followed.

¶ 8 St. Luke's raises two issues for our consideration:

1. Did the trial court err as a matter of law in holding that St. Luke's Hospital owed a legal duty to prevent Dr. Campo, a board-certified anesthesiologist, from taking a fatal drug overdose with a controlled substance that he unlawfully diverted from the hospital's pharmacy?

2. Did the trial court commit legal error in finding that the evidence was sufficient to support a finding of negligence on the part of St. Luke's Hospital absent:

(a) expert testimony establishing a breach of the standard of care of a hospital with respect to the dispensing of controlled substances; and/or

(b) evidence establishing a causal connection between any lack of due care by the hospital in the dispensing of controlled substances and Dr. Campo's death?

¶ 9 "We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case." *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa.Super.1999). Further, "[t]he standard of review for an appellate court is the same as that for a trial court." *Ferry v. Fisher*, 709 A.2d 399, 402 (Pa.Super.1998).

> There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Rohm & Haas Co. v. Continental Cas. Co.*, 732 A.2d 1236, 1247 (Pa.Super.1999) (quoting *Moure v. Raeuchle*, 529 Pa. 394, 402–03, 604 A.2d 1003, 1007 (1992)).

¶ 10 It is axiomatic that the elements of a negligence-based cause of ac-

**2.** Dr. Schwendeman settled with Mrs. Campo, post-verdict, on April 20, 1999.

tion are a duty, a breach of that duty, a causal relationship between the breach and the resulting injury, and actual loss. *J.E.J. v. Tri–County Big Brothers/Big Sisters*, 692 A.2d 582 (Pa.Super.1997).

> When considering the question of duty, it is necessary to determine "whether a defendant is under any obligation for the benefit of the particular plaintiff ... and, unless there is a duty upon the defendant in favor of the plaintiff which has been breached, there can be no cause of action based upon negligence."

*Tri–County Big Brothers*, 692 A.2d at 584 (quoting *Hoffman v. Sun Pipe Line Co.*, 394 Pa.Super. 109, 113–15, 575 A.2d 122, 125 (1990)). "Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution." *Brandjord v. Hopper*, 455 Pa.Super. 426, 429–31, 688 A.2d 721, 723 (1997) (citing *Cruet v. Certain–Teed Corp.*, 432 Pa.Super. 554, 556–58, 639 A.2d 478, 479 (1994)). "Our duty analysis depends on many factors and is 'necessarily rooted in public policy considerations, i.e., our ideas of history, morals, justice, and society in general in determining where the loss should fall.'" *Althaus v. Cohen*, 710 A.2d 1147, 1152 (Pa.Super.1998), *appeal granted*, 556 Pa. 701, 729 A.2d 1124 (1998), (quoting *Gardner v. Consolidated Rail Corp.*, 524 Pa. 445, 455, 573 A.2d 1016, 1020 (1990)). Moreover,

> Duty, as a concept, is a flexible notion. "In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than 'the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection' from the harm suffered." *Troxel v. A.I. Dupont Institute*, 450 Pa.Super. 71, 82, 675 A.2d 314, 319–320 (1996), quoting *Gardner by Gardner v. Consolidated Rail Corp.*, 524 Pa. 445, 454–455, 573 A.2d 1016, 1020 (1990), quoting *Sinn v. Burd*, 486 Pa. 146, 164,

404 A.2d 672, 681 (1979). Furthermore, "duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the question...." *Id.* "To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times." *Id.*

*Huddleston v. Infertility Center of America, Inc.*, 700 A.2d 453, 457–58 (Pa.Super.1997). Finally, a duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others. *Id.* at 457. It is "[o]nly when the question of foreseeability is undeniably clear may a court rule as a matter of law that a particular defendant did not have a duty to a particular plaintiff." *Tri–County Big Brothers*, 692 A.2d at 584; *Hoffman*, 575 A.2d at 125. *See Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928).

¶ 11 The primary basis for the trial court's finding that St. Luke's owed a duty to Dr. Campo arises from the Controlled Substance, Drug, Device and Cosmetic Act. 35 P.S. §§ 780–101, *et seq.* Under the Act, substances such as Fentanyl and Demerol are classified as "Schedule II" substances and are determined to have a "high potential for abuse ... and may lead to severe psychic or physical dependence." 35 P.S. § 780–104(2). The recordkeeping requirements, relied upon by the trial court, provide:

> b) Every practitioner licensed by law to administer, dispense or distribute controlled substances shall keep a record of all such substances administered, dispensed or distributed by him, showing the amount administered, dispensed or distributed, the date, the name and address of the patient.... Such record shall be kept for two years form the date of administering, dispensing or distributing such substance and shall be open for inspection by the proper authorities.

c) Persons registered or licensed to manufacture or distribute or dispense a controlled substance, other drug or device under this act shall keep records and maintain inventories in conformity with the record-keeping, order form and inventory requirements of Federal law and with any additional regulations the secretary issues. Controlled substances in Schedules I and II shall be distributed by a registrant to another registrant only pursuant to an order form.

35 P.S. § 780–112(b) & (c). Additionally, the Pennsylvania Code provides:

a) Persons maintaining stocks or having controlled substances in production areas or on hand for distribution shall provide effective controls and procedures to guard against theft and diversion of the substances.

b) Physical security controls shall be commensurate with the schedules and quantity of controlled substances on hand and required for normal business operations....

28 Pa.Code. § 25.61(a) & (b).[3]

¶ 12 The violation of a statute may serve as the basis for a finding of negligence *per se;* this concept establishes both duty and breach of duty where an individual violates an applicable statute, ordinance or regulation designed to prevent a public harm. *Tri–County Big Brothers*, 692 A.2d at 585. In their analysis of the statute, however, both the trial court and appellee stop short of labeling this case one of negligence *per se.* Rather, they appear to highlight the relevant statutory sections as one example of support for their determination that St. Luke's did have a duty to protect Dr. Campo.[4]

¶ 13 In its claim that it had no duty to protect Dr. Campo from his own illicit drug use, St. Luke's places heavy reliance on two cases in which the Pennsylvania Supreme Court refused to impose liability for individual harms under statutes designed to protect the public at large. In *Klein v. Raysinger*, 504 Pa. 141, 470 A.2d 507 (1983), the court determined that the Liquor Code, 47 P.S. § 4–493(1), which prohibits a liquor licensee from serving alcohol to a visibly intoxicated person, does not create a civil cause of action against non-licensed persons for providing alcohol to adults. In finding no duty on the part of a social host to a plaintiff injured by an intoxicated adult guest, the court explained that "the great weight of authority supports the view that in the case of an ordinary able bodied man it is the consumption of alcohol, rather than the furnishing of the alcohol, which is the proximate cause of any subsequent occurrence."[5] *Id.* at 148, 470 A.2d at 510.[6] "The consequences

---

3. The Controlled Substance, Drug, Device and Cosmetic Act requires the Secretary of Health to issue regulations controlling the substances. 35 P.S. § 780–103(a)(9). Pursuant to such authority, the relevant Pennsylvania Code sections were promulgated.

4. Mrs. Campo's brief states: "The legislative/regulatory standards are a source of public policy and provided one means for this court to conclude that the hospital owed a duty to Dr. Campo." She further claims that the statutory pronouncements "verify the public policy basis for establishing the hospital's duty."

5. As the late Dean Prosser suggests, the concepts of duty and proximate cause ultimately involve similar policy considerations:

The ordinary usage of the courts has been to confine the word "duty" to questions of the existence of some relation between the defendant and the plaintiff which gives rise to the obligation of conduct in the first instance, and to deal with the connection between that obligation, once it has arisen, and the consequences which have followed in the language of "proximate cause." The usage is no doubt well enough, so long as it is not allowed to obscure the fact that identical questions are often still involved, and buried under the two terms, sometimes so deeply that a good deal of digging is called for to uncover them.

*Gardner v. Consolidated Rail Corporation*, 524 Pa. 445, 454 n. 6, 573 A.2d 1016, 1020 n. 6 (1990) (*quoting* The Law of Torts (Fourth ed.) § 42, p. 245).

6. The trial court's reliance on the similar case of *Congini by Congini v. Portersville Valve Co.,*

of accepting intoxicants were left to the personal responsibility of the guest, and the host was not required to answer for their effect." *Orner v. Mallick*, 515 Pa. 132, 135–37, 527 A.2d 521, 523 (1987) (citing *Klein, supra*).

¶ 14 In a more recent case, *Witthoeft v. Kiskaddon*, 557 Pa. 340, 733 A.2d 623 (1999), the supreme court concluded that an ophthalmologist's failure to report a patient's poor eyesight to the Department of Transportation, in violation of the Motor Vehicle Code, did not subject him to civil liability for injury that the patient caused to a bicyclist in a car accident. The court espoused that while the Motor Vehicle Code "benefits the public at large, it does not benefit [the plaintiff] as a member of a particular class for whose 'especial' benefit the statute was enacted." *Id.* at 347–49, 733 A.2d at 627 (citations omitted). In reaching this conclusion, the court noted that our United States Supreme Court "has been extremely reluctant to imply private causes of action under statutes that 'create duties on the part of persons for the benefit of the public at large.'" *Id.* Notably, the court in *Witthoeft*, as in *Klein, supra*, placed responsibility for the harm on the individual who was in the best position to police his own conduct, concluding that it is an "unreasonable extension of the concept of duty and foreseeability" to broaden a physician's duty to a patient, under the facts of the case, when the patient herself was necessarily aware of her poor eyesight. *Witthoeft*, 733 A.2d at 630.

¶ 15 *Witthoeft* and *Klein* both reflect our supreme court's narrow interpretation of what type of person falls within the ambit of a statute designed to protect the public at large. Additionally, both cases

reveal the court's requirement that the harm suffered be that which the statute was designed to protect. Finally, the cases reflect the court's policy requiring an individual to answer for his or her own indiscretions, as opposed to placing responsibility on another for failure to protect against such conduct. *See Howell v. Clyde*, 533 Pa. 151, 162, 620 A.2d 1107, 1112 (1993) ("[T]he policy against recovery for 'self-inflicted' injuries remains as viable today as it ever was.").

¶ 16 In emphasizing that the legislature has recognized that Dr. Campo's drugs of choice have a significant potential for abuse under the Controlled Substance Act, the trial court makes the unsupported conclusion that the Act and related regulations gave rise to a duty for the hospital "to protect not only the general public, but also the medical community from obtaining these substances for non-medical purposes." From a policy standpoint, this reasoning is flawed. By allowing Dr. Campo's estate to recover $5.6 million for his self-inflicted drug overdose, the trial court is essentially rewarding drug abuse among medical practitioners. The hospital's knowledge that physicians may divert and use such controlled substances does not create a duty for *their* benefit. Rather, the "rudimentary offense" that the Controlled Substance Act seeks to punish is the unauthorized possession of controlled drugs. *See Commonwealth v. Sojourner*, 268 Pa.Super. 488, 493–95, 408 A.2d 1108, 1111 (1979). Moreover, in imposing the Act, "the legislature was exercising its police power in the protection of the health and safety of the citizens of this Commonwealth." *Whitehall Labs. v. Wil-*

504 Pa. 157, 470 A.2d 515 (1983), is misplaced. There, our supreme court found that an adult social host who furnishes alcohol to a minor can be civilly liable for that minor's subsequent actions on a theory that the adult is an accomplice in the minor's violation of 18 Pa.C.S.A. § 6308 of the Crimes Code. *Congini* dealt with the specific problem of adults furnishing alcohol to minors, the latter being a class of people that the legislature deemed

incompetent to handle the effects of alcohol. The court explained that because the legislature considered minors incapable of safely ingesting alcohol, the purpose of section 6308 was to protect minors and third parties from injury. *Id.* at 518. *See Kapres v. Heller*, 536 Pa. 551, 640 A.2d 888 (1994) (explaining that the civil accomplice liability rule enunciated in *Congini* is to be narrowly construed).

*bar*, 397 Pa. 223, 230, 154 A.2d 596, 600 (1959). Thus, the purpose of the Act is to deter, not reward, the unlawful possession of a controlled substance.

¶ 17 Mrs. Campo emphasizes that the hospital knew or should have known of the potential for drug abuse among its medical staff, thus imposing a duty to protect Dr. Campo. St. Luke's, however, does not contend that it was unaware of the potential for drug abuse among doctors, nor does it contest that it was obligated to implement a drug distribution system consistent with the Act. Rather, it claims, and we agree, that any duty owed in this instance does not extend to the protection of Dr. Campo from his own addiction and resulting death. It is, after all, a question of fairness. *Brandjord, supra*. Placing a duty on the part of the hospital to monitor its controlled substances simply does not translate into an award of monetary relief for the injury suffered herein. As we previously noted, "duty is only a word with which we state … that there is or is not to be liability." *Huddleston*, 700 A.2d at 458. Allowing recovery for the unfortunate but self-inflicted harm suffered by Dr. Campo is inconsistent with Pennsylvania authority encouraging personal responsibility for one's own transgressions. *See Witthoeft, supra; Klein, supra.*

¶ 18 As we have determined that the hospital's duty does not encompass the regrettable harm suffered by Dr. and Mrs. Campo, we need not address appellant's second issue.

¶ 19 Reversed.