J.A31043/13

2014 PA Super 188

| | | |
|---|---|---|
| ALBERT CHARLIE D/B/A RILEY'S RESTAURANT & PUB AND ZACHARY NEIDERT, | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : | |
| ERIE INSURANCE EXCHANGE A/S/O JEFFREY DORN AND ROCHELLE DORN D/B/A EGYPT LAUNDROMAT, | : : : : | |
| Appellant | : | No. 1807 EDA 2013 |

Appeal from the Order Entered May 30, 2013
In the Court of Common Pleas of Lehigh County
Civil Division No(s).: 2011-C-3496

BEFORE: BENDER, P.J., LAZARUS, and FITZGERALD,[*] JJ.

OPINION BY FITZGERALD, J.:                                **FILED AUGUST 29, 2014**

Appellant, Erie Insurance Exchange, as subrogee of Jeffrey Dorn and Rochelle Dorn, doing business as Egypt Laundromat, appeals from the order entered in the Lehigh County Court of Common Pleas granting summary judgment in favor of Appellees, Albert Charlie, doing business as Riley's Restaurant & Pub, and Zachary Neidert. Appellant contends the trial court should have held that Appellees had an affirmative duty to prevent greasy rags in Appellant's laundromat dryer from spontaneously combusting. We hold that Appellant has not met its burden for imposing a duty upon all

_____

[*] Former Justice specially assigned to the Superior Court.

laundromat customers to prevent laundered rags from spontaneously combusting. Accordingly, we affirm.

We state the facts as set forth by the trial court:

> This case is a property damage subrogation action arising out of a fire that occurred on April 4, 2011, at the Egypt Laundromat located at 4755 Main Street, Egypt, Pennsylvania. Riley's Restaurant & Pub (Riley's) is a business located at 4505 Main Street, Egypt, Pennsylvania. During all relevant times, Zachery Neidert (Neidert) was working in the course and scope of his employment as a bartender at Riley's.

> Riley's offers a variety of food to its patrons, including: chicken wings, cheesesteaks, hamburgers, chicken sandwiches, salads, clams, some entrees, french fries, chicken fingers and jalapeno poppers. The food is prepared in Riley's kitchen which houses two ovens, eight burners, a flat top grill and a deep fryer filled with oil used to cook the french fries, chicken fingers and jalapeno poppers.

> Cotton rags are used at Riley's on a daily basis to wipe down, clean and absorb excess food, debris, residue, dirt and oils from areas including the bar top, stools, tables, windowsills, televisions, juke box and video games. Riley's employees would use their common sense to determine when a bar rag was ready to be cleaned, and the rag would be put into some type of laundry bag. Every one to two weeks, the dirty bar rags were taken to Egypt Laundromat, two blocks away from Riley's, where an employee of Riley's would wash and dry them. Neidert was an employee of Riley's for six years as of April 4, 2011. Neidert had noticed on prior occasions at Egypt Laundromat that the rags did not really get cleaned after being washed, that the washing machine did not get all the stuff out of the rags. Neidert began using three washers instead of two in an attempt to have the washing machines clean the rags better.

> On April 4, 2011, at 6:51 p.m., Neidert arrived at Egypt Laundromat, placed Riley's soiled cotton rags into three

washing machines and left. At approximately 9:49 p.m., Neidert returned to Egypt Laundromat and removed the bar rags from the three washing machines. Neidert testified that the bar rags were wet and kind of balled together; he did not pay attention to whether or not they looked clean. Neidert put all three loads of bar rags into a single dryer, inserted nine quarters for a 63 minute drying cycle, started the dryer, and then left the Laundromat. The dryer stopped spinning at 10:50 p.m. At 12:25 a.m., the bar rags began to smolder. At 12:45 a.m., an unidentified laundromat patron opened the door to the subject dryer. Neidert returned to the laundromat at 12:49 a.m., observed flames inside the dryer and unsuccessfully attempted to extinguish the fire. At approximately 12:58 a.m., the Whitehall Volunteer Fire Department personnel arrived at the laundromat and extinguished the fire.

Trial Ct. Op., 5/20/13, at 2-3.

We also reproduce the following exchange from the deposition of Mr. Neidert:

[Appellant's counsel:] Have you ever heard of any phenomenon where laundry can catch on fire if there is too much grease or sediment within the laundry itself?

A. Like spontaneous combustion?

Q. Yes.

A. I've heard of it. I've never heard of it for grease. I've heard of spontaneous combustion where something can just light on fire.

* * *

Q. Have you ever heard of that phenomenon where if there is vegetable oil or something left within the linen, that it can cause fire?

A. I've heard like greasy rags causing fires in, like, people's garages or something. Like oily rags. I always thought that was motor oil or gasoline and stuff like that?

Ex. B to Appellant's Br. in Resp. to Appellees' Mot. for Summ. J. Further, no party disputes that the rags at issue were used to clean up nicotine, spilled drinks, and incidental grease from spilled food. **See** Appellant's Brief at 7-8; Appellee's Brief at 3-4. We acknowledge, however, that the parties dispute whether the rags were "soaked" in oil, grease, or nicotine and whether one of the parties used laundry detergent or a degreasing solution in the washers.[1]

On November 3, 2011, Appellant filed a complaint raising two counts of negligence against Appellees. Appellees moved for summary judgment on the basis that because spontaneous combustion—by its very nature—is not typically viewed as a reasonably foreseeable risk, the law did not impose an affirmative duty to prevent spontaneous combustion. Accordingly, Appellees asserted they could not be held negligent as a matter of law.

---

[1] We note Appellant characterizes the rags as "soiled," "soaked," or "saturated" with "flammable cooking" or vegetable oil in its brief. **See, e.g.**, Appellant's Brief at 7-8 (referencing R.R. 122a). Appellant's references, however, state that the rags were used to wipe up grease from spilled food, **see, e.g.**, **id.**, which is arguably different than being "soaked" or "saturated" with cooking oil. Although Appellant's characterizations strain credulity, we view the record in the light most favorable to it. **See Gutteridge v. A.P. Green Servs., Inc.**, 804 A.2d 643, 651 (Pa. Super. 2002) (citations omitted).

On May 21, 2013, the court granted Appellees' motion for summary judgment.[2]  The trial court applied the five factors set forth in **Althaus ex rel. Althaus v. Cohen**, 562 Pa. 547, 553, 756 A.2d 1166, 1169 (2000), for establishing the existence of a duty.  The court reasoned that Appellees were business invitees, laundering bar rags had social value, spontaneous combustion of washed rags left in a dryer was not a foreseeable risk, and imposition of Appellant's proposed mandates, as set forth below, were unfeasible.  Trial Ct. Op. at 6-10.  Appellant timely appealed and the court did not order Appellant to comply with Pa.R.A.P. 1925(b).

Appellant raises the following questions:

> Did the trial court commit reversible error when it decided as a matter of law that [Appellees], a bar owner and its employee, did not owe a duty of ordinary care to Egypt Laundromat to prevent the bar's oil soaked bar rags from causing a fire in the laundromat?
>
> Did the trial court commit reversible error in the manner in which it analyzed the factors in **Althaus [ex rel. Althaus] v. Cohen**, 756 A.2d 11[6]6, 11[69] (Pa. 2000) by concluding, among other things, that the ability to clean bar rags in a public laundromat without regard to the risk of spontaneous combustion is of extreme social importance and that the minimal burden of imposing a duty on a commercial establishment to educate itself regarding the risks of laundering its own bar rags outweighs the important public interest in preventing fires?
>
> Did the trial court commit reversible error when it weighed conflicting evidence and made credibility determinations in

---

[2] The order, which was dated and mailed on May 20, 2013, was docketed on May 21, 2013.

favor of . . . Appellees, the moving party, when deciding [Appellees'] motion for summary judgment?

Appellant's Brief at 4.

We summarize Appellant's arguments for its first two issues together, as they are interrelated. Appellant states the trial court erred by not recognizing that the relationship between Egypt Laundromat and Appellees was a bailment for mutual benefit.[3] Appellant opines that Appellees, as bailees, "owe[ ] a duty of ordinary care to" Appellant, the bailor.[4] *Id.* at 19. Appellant alternatively characterizes the parties' relationship as licensee/licensor, citing **Garcia v. Halsett**, 82 Cal. Rptr. 420 (Cal. Ct. App. 1970). By extension, Appellant suggests, the court misapplied the five-factor **Althaus** test for identifying the existence of a duty. **See** Appellant's Brief at 21-22 (arguing that "recognizing the proper relationship between the parties [by the trial court] would have compelled finding the existence of a duty."). Appellant claims that under the **Althaus** test, the trial court gave undue weight to the social utility of Appellees' conduct. It insists spontaneous combustion is a reasonably foreseeable risk and imposing a legal duty upon all "commercial food service establishments" to prevent

---

[3] Appellant apparently assumes that in order to obtain tort relief, the parties' relationship must be legally defined, *e.g.*, bailment or licensee. That supposition would be incorrect. **See Lindstrom v. City of Corry**, 563 Pa. 579, 586, 763 A.2d 394, 397 (2000) (examining police officer's relationship to driver fleeing said officer).

[4] As explained below, Appellant misapprehends that it is a bailor.

spontaneous combustion when laundering rags would result in minimal public policy consequences. *Id.* at 33. We hold Appellant is due no relief.

The standard and scope of review for summary judgment is well-established:

> Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontr[o]verted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment. . . . With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion.

*Gutteridge*, 804 A.2d at 651 (citations omitted). "The determination [of] whether to impose affirmative common-law duties as a predicate to civil liability is a matter of law; accordingly, our review is plenary." *Seebold v. Prison Health Servs., Inc.*, 618 Pa. 632, 650, 57 A.3d 1232, 1243 (2012).

Generally, "[n]egligence is defined as the absence of care under the circumstances[.]" *Brusis v. Henkels*, 376 Pa. 226, 230, 102 A.2d 146, 148

(1954) (citations omitted). "The test of negligence is whether the wrongdoer could have anticipated and foreseen the likelihood of harm to the injured person, resulting from his act[.]" *Id.* (citations omitted). "It is axiomatic that the elements of a negligence-based cause of action are a duty, a breach of that duty, a causal relationship between the breach and the resulting injury, and actual loss." *Minnich v. Yost*, 817 A.2d 538, 541 (Pa. Super. 2003) (quoting *Campo v. St. Luke's Hosp.*, 755 A.2d 20, 23-24 (Pa. Super. 2000)).

> While the existence of a duty is a question of law, whether there has been a neglect of such duty is generally for the jury. However, the issue of whether an act or a failure to act constitutes negligence may be removed from consideration by a jury and decided as a matter of law when the case is free from doubt and there is no possibility that a reasonable jury could find negligence.

*Emerich v. Phila. Ctr. for Human Dev., Inc.*, 554 Pa. 209, 233, 720 A.2d 1032, 1044 (1998). "[I]f no care is due, it is meaningless to assert that a person failed to act with due care." *T.A. v. Allen*, 447 Pa. Super. 302, 307, 669 A.2d 360, 362 (1995) (*en banc*) (quoting *Wenrick v. Schloemann-Siemag Aktiengesellschaft*, 523 Pa. 1, 8, 564 A.2d 1244, 1248 (1989)).

"[A] duty arises **only** when one engages in conduct which foreseeably creates an **unreasonable** risk of harm to others." *Campo*, 755 A.2d at 24 (emphases added). In *Althaus*, our Supreme Court set forth a non-exclusive five-factor test for determining the existence of a duty, *i.e.,*

whether, as a matter of law, a defendant is under any obligation for the benefit of a plaintiff:

> In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than "the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection" from the harm suffered[.] . . . To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:
>
> These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, "always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."
>
> Thus, the legal concept of duty of care is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society. The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship

between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution. . . . ***See also Bird v. W.C.W.***, 868 S.W.2d 767, 769 (Tex[.] 1994) ("In determining whether to impose a duty, this Court must consider the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the actor.").

***Althaus***, 562 Pa. at 552-53, 756 A.2d at 1168-69 (some citations omitted). Courts are not required to weigh each factor equally. ***Id.*** at 553, 756 A.2d at 1169.

Courts, however, are "least well suited" for determining whether a duty exists as a matter of law because it "is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations." ***Seebold***, 618 Pa. at 653 & n.19, 57 A.3d at 1245 & n.19 (citation omitted). The ***Seebold*** Court emphasized that in ascertaining the existence of a duty, "such nebulous undertakings" by the courts, "do not serve as a favorable underpinning for closely reasoned judicial decision-making."[5] ***Id.*** at 653, 57 A.3d at 1245. In sum, the

---

[5] Moreover, the ***Seebold*** Court observed,

the adjudicatory process—premised on adversarial presentations[,] which by their nature may be skewed in favor of the individual interests at stake—does not consistently translate well into the field of broader policymaking. Along these lines, we have often recognized

**Seebold** Court reiterated that because our Legislature is in the best position to establish public policy and impose affirmative duties,

> **the default position** [of our courts is] that, unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating, we will not impose new affirmative duties. **See** [**Cafazzo v. Cent. Med. Health Servs., Inc.**, 542 Pa. 526, 537, 668 A.2d 521, 527 (1995)] ("[B]efore a change in the law is made, a court, if it is to act responsibly[,] must be able to [fore]see with reasonable clarity the results of its decision and to say with reasonable certainty that the change will serve the best interests of society." (quoting [**Hoven v. Kelble**, 79 Wis. 2d 444, 470, 256 N.W.2d 379, 391 (1977)[6]]).

**Id.** at 653-54, 57 A.3d at 1245 (emphasis added).[7]

As set forth above, the **Althaus** Court identified five non-exclusive factors[8] courts should consider before imposing a legal duty upon the public. **See Althaus**, 562 Pa. at 552-53, 756 A.2d at 1168-69.  With respect to the

---

> the superior tools and resources available to the Legislature in making social policy judgments, including comprehensive investigations and policy hearings.

**Seebold**, 618 Pa. at 653, 57 A.3d at 1245 (citations and footnote omitted).

[6] Because the **Cafazzo** Court slightly misquoted the **Hoven** Court, we altered the quotation to reflect the original language.

[7] The **Seebold** Court ultimately refused to impose a legal duty upon a physician treating prison inmates to notify correctional officers that a particular inmate has a communicable disease.  **Seebold**, 618 Pa. at 661, 57 A.3d at 1250.

[8] Neither party has suggested the trial court should have considered an additional factor.

***Althaus*** factors regarding the parties' relationship and foreseeability of the harm, this Court emphasized the limited scope of both:

> Duty, in any given situation, is predicated upon the relationship existing between the parties at the relevant time. Where the parties are strangers to each other, such a relationship may be inferred from the general duty imposed on all persons not to place others at risk of harm through their actions.

***Alumni Ass'n, Delta Zeta Zeta of Lambda Chi Alpha Fraternity v. Sullivan***, 369 Pa. Super. 596, 601, 535 A.2d 1095, 1098 (1987) [hereinafter ***Sullivan***] (citation omitted). The relationship between the parties, therefore, does not have to be a specific, legally defined relationship, *e.g.*, bailor-bailee, licensor-licensee, or business invitee. ***See id.***

Regardless, because the instant Appellant contends the trial court, as noted above, erroneously characterized the parties' relationship as business invitee instead of bailor-bailee or licensor-licensee, we summarize the applicable law. "Generally, the determination of whether an individual is an invitee [or] licensee" is a question for the fact-finder but "[w]here the evidence is insufficient to support an issue, however, it may be appropriate for the court to remove that issue from the jury." ***Palange v. City of Phila., Law Dept.***, 433 Pa. Super. 373, 377, 640 A.2d 1305, 1307 (1994).

"The bailor is the party who delivers the goods involved to the other party, the bailee, under the bailment contract." 6 Pa. Law Encyclopedia 2d,

Bailment § 1 (2009). Thus, a bailor-bailee relationship generally requires the existence of a contract:

> A bailment is a delivery of personalty for the accomplishment of some purpose upon a **contract**, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it[.] As a general rule, a bailor is not liable for the negligence of the bailee in the operation of a bailed chattel[.]

**Smalich v. Westfall**, 440 Pa. 409, 413, 269 A.2d 476, 480 (1970) (citations omitted and emphasis added). Put differently:

> To constitute bailment, there must be a delivery of personal property to another, who accepts possession of the property, and exercises custody and control over it. While a contract of bailment may be implied, such contract can arise only when the natural and just interpretation of the acts of the parties warrants such a conclusion.

**Riggs v. Com., Dept. of Transp.**, 76 Pa. Commw. 227, 230-31, 463 A.2d 1219, 1220-21 (1983) (citations omitted);[9] **see also** 6 Pa. Law Encyclopedia 2d, Bailment § 1 ("Broadly, bailments amount to contracts that demand the transfer of possession of personal property without the transfer of ownership to the property . . . ." (footnote omitted)).

---

[9] "Although decisions of the Commonwealth Court are not binding on this Court, we may rely on them if we are persuaded by their reasoning." **NASDAQ OMX PHLX, Inc. v. PennMont Secs.**, 52 A.3d 296, 308 n.7 (Pa. Super. 2012) (citation omitted).

A licensor-licensee relationship, however, unlike a bailor-bailee relationship, does not involve a transfer of personal property. ***Oswald v. Hausman***, 378 Pa. Super. 245, 253-54, 548 A.2d 594, 598-99 (1988).

> A "licensee" is a person whose entry upon or use of the premises in question is by express or implied permission of the owner or occupier. A licensee enters upon the land of another solely for his own purposes; the invitation extended to him is given as a favor by express consent or by general or local custom, and is not for either the business or social purposes of the possessor.

***Id.*** at 253-54, 548 A.2d at 598-99 (citations omitted); ***accord T.A.***, 447 Pa. Super. at 308, 669 A.2d at 363. Examples of licensees include the following:

> 1. One whose presence upon the land is solely for his own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual, whether by express or tacit consent or as a matter of general or local custom.
>
> 2. The members of the possessor's household, except boarders or paying guests and servants, who . . . are invitees.
>
> 3. Social guests. . . .

Restatement (Second) of Torts, § 330 cmt. h (1965).

In contrast, a business invitee is a "person who is invited to enter or remain on land for a purpose directly or indirectly connected with the business dealings with the possessor of the land." Restatement (Second) of Torts, § 332 (1965); ***accord T.A.***, 447 Pa. Super. at 308, 669 A.2d at 363. "The duty owed to a business invitee is the highest duty owed to any entrant

upon land. The landowner is under an affirmative duty to protect a business visitor not only against known dangers but also against those which might be discovered with reasonable care." **Emge v. Hagosky**, 712 A.2d 315, 317 (Pa. Super. 1998) (citation omitted).

Instantly, we examine the first **Althaus** factor. As reiterated above, the trial court held that Appellees were business invitees. Trial Ct. Op. at 6. With respect to a bailor-bailee[10] relationship, Appellant has not established the existence of a contract, either express or implied. **See Smalich**, 440 Pa. at 413, 269 A.2d at 480; **see also** 6 Pa. Law Encyclopedia 2d, Bailment § 1. Appellant did not demonstrate that Appellees delivered personalty to it and Appellant accepted possession and exercised "custody and control" over it. **See Riggs**, 76 Pa. Commw. at 230-31, 463 A.2d at 1220-21. Moreover, we question whether Appellant would have agreed to possess and control Appellees' rags. **See id.**

As to whether Appellees were licensees and licensed to use Appellant's laundry equipment, Appellees undeniably entered Appellant's property for

---

[10] As noted above, Appellant appears to suggest it is the bailor. **See** Appellant's Brief at 19. The bailor, however, is the party delivering the goods, not receiving them. 6 Pa. Law Encyclopedia 2d, Bailment § 1. If Appellant successfully established a claim that it was the bailee, then it would owe a duty to Appellees, *i.e.*, bailors. **See id.** Furthermore, as bailee, Appellant's damage claims would be generally limited to the value of its interest in the alleged bailed goods, *i.e.*, the rags. **See generally** 6 Pa. Law Encyclopedia 2d, Bailment § 35. Appellant's damage claims, however, are for damages to the laundromat—not rags. **See, e.g.**, Appellant's Compl., 10/3/11, at 3 (unpaginated).

business purposes. *See Oswald*, 378 Pa. Super. at 253-54, 548 A.2d at 598-99; Restatement (Second) of Torts, § 330 cmt. h. Appellant, for example, did not extend a personal favor to Appellees to enter the premises, Appellees are not members of Appellant's household, and Appellees are not social guests. *See* Restatement (Second) of Torts, § 330 cmt. h. Appellees did not enter the laundromat solely for their own purposes; Appellees had to use Appellant's laundry equipment. *See Oswald*, 378 Pa. Super. at 253-54, 548 A.2d at 598-99. Appellees were business visitors invited to enter Appellant's property for a purpose directly connected with Appellant's business: laundering. *See T.A.*, 447 Pa. Super. at 308, 669 A.2d at 363; *see also Emge*, 712 A.2d at 317. Appellant proffers no plausible explanation as to why the parties' relationship is anything other than a business invitee.[11] In sum, Appellant failed to substantiate as a matter of law or identify material issues of fact regarding a bailor-bailee or licensor-licensee relationship.[12] Nonetheless, a relationship does exist between the

---

[11] We decline to consider *Garcia*, which was cited by Appellant, as it is a non-binding California case. *See Commonwealth v. Nat'l Bank & Trust Co. of Cent. Pa.*, 469 Pa. 188, 194, 364 A.2d 1331, 1335 (1976) (noting, "it is a truism that decisions of sister states are not binding precedent on this Court . . . .").

[12] We reiterate that a legally defined relationship is not required for the first *Althaus* factor. *See Sullivan*, 369 Pa. Super. at 601, 535 A.2d at 1098. We also recognize that a particular, legally defined relationship may include a duty of care. *See, e.g.*, *Gutteridge*, 804 A.2d at 656; *Emge*, 712 A.2d at 317. But to the extent Appellant argues that a legally defined relationship *ipso facto* mandates the existence of a particular legal duty, *see* Appellant's

parties, as Appellees voluntarily used Appellant's laundromat to launder rags.[13]

We next examine the second **Althaus** factor: social utility. In **Althaus**, our Supreme Court resolved the issue of "whether a therapist who treats a child for alleged parental sexual abuse owes a duty of care to the child's parents in a therapeutic treatment situation where the child allegedly has been abused by the parents."[14]  **Althaus**, 562 Pa. at 549, 756 A.2d at 1167.  The **Althaus** Court reasoned that "therapists who treat sexually abused children perform a valuable and useful activity to society."  **Id.** at 554, 756 A.2d at 1170.  Thus, our Supreme Court held that "social utility disfavors expanding therapists' duty of care to non-patients, especially where the non-patients are the accused victimizers."  **Id.**  The **Althaus**

---

Brief at 22, that argument contradicts our obligation to weigh and consider five factors of the **Althaus** test and not just the first factor.  **See Althaus**, 562 Pa. at 552-53, 756 A.2d at 1168-69.  We decline to hold that upon establishing a legally defined relationship, *e.g.*, bailor-bailee, it **necessarily** follows that a party has a duty of care to, *e.g.*, prevent spontaneous combustion.

[13] The parties do not discuss the duties a business invitee—such as Appellees—would have to a business owner.

[14] The case arose from a medical malpractice action in which the child's parents sued the therapist for negligent diagnosis and treatment.  **Althaus**, 562 Pa. at 551, 756 A.2d at 1168.  A jury found in the parents' favor, and the therapist appealed, arguing she did not owe a duty to the non-patient parents.  **Id.**

Court then weighed the social utility of the therapist's conduct "against the nature of the risk and foreseeability of harm." *Id.* at 555, 756 A.2d at 1170.

In *Forster v. Manchester*, 410 Pa. 192, 189 A.2d 147 (1963), our Supreme Court considered the social utility of a private investigator's conduct in following an insurance claimant. *Id.* at 193, 189 A.2d at 148. The investigator had followed and filmed the claimant in public to record her daily activities and "ascertain the extent to which [the claimant] has freedom of movement over [her] limbs." *Id.* at 194, 189 A.2d at 148. The *Forster* Court held "we feel that there is much social utility to be gained from these investigations. It is in the best interests of society that valid [insurance] claims be ascertained and fabricated claims be exposed." *Id.* at 197, 189 A.2d at 150 (footnote omitted).

In *Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000 (2003), a young child obtained a butane lighter and started a fire that ultimately killed him, his mother, and another child. *Id.* at 649, 841 A.2d at 1003. Our Supreme Court examined "the social utility of [the manufacturer's] conduct, namely, the production of a butane lighter without child safety features." *Id.* at 659, 841 A.2d at 1009. The *Phillips* Court acknowledged that a lighter "has obvious social utility as a reliable, convenient method to create a flame," but that "the benefits of one lacking a child resistant feature are not so plain." *Id.* Further, the record did not show that the lighter's utility increased without a child safety mechanism. *Id.* Given the nature of

young children, the **Phillips** Court opined that child safety features on a lighter would "have great utility." **Id.** at 660, 841 A.2d at 1009.

The instant trial court noted laundering bar rags had social value. Trial Ct. Op. at 6. In comparison to treating children who have been sexually abused, investigating potential insurance fraud, and manufacturing a lighter, the social utility of Appellees' conduct—laundering rags—has relatively minimal societal impact. **Cf. Phillips**, 576 Pa. at 660, 841 A.2d at 1009; **Althaus**, 562 Pa. at 554, 756 A.2d at 1170; **Forster**, 410 Pa. at 197, 189 A.2d at 150. Appellees' conduct of cleaning rags is primarily of private advantage with an arguable, attenuated public interest in having clean establishments. At best, this factor is in equipoise[15] and we must weigh the social utility of Appellees' conduct of laundering rags against the third **Althaus** factor, "the nature of the risk and foreseeability of" spontaneous combustion. **See Althaus**, 562 Pa. at 554, 756 A.2d at 1170.

"Regarding the third [**Althaus**] factor, duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." **R.W. v. Manzek**, 585 Pa. 335, 348, 888 A.2d 740, 747 (2005)

---

[15] Because the standard of review is *de novo*, we need not defer to the determination of the trial court. **See Seebold**, 618 Pa. at 650, 57 A.3d at 1243.

J. A31043/13

(citing, *inter alia*, **Griggs v. BIC Corp.**, 981 F.2d 1429, 1435 (3d Cir. 1992));[16] **Campo**, 755 A.2d at 24.

> [T]he concept of foreseeability means the likelihood of the occurrence of a **general** type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury.  Although it is true that a defendant is not required to guard against every possible risk, he must take reasonable steps to guard against hazards which are generally foreseeable.

**Huddleston v. Infertility Ctr. of Am., Inc.**, 700 A.2d 453, 460 (Pa. Super. 1997) (citation and punctuation omitted).

For example, in **Lindstrom**, our Supreme Court examined whether a police department owed "a common law duty to a driver who flees from a police officer . . . ."  **Lindstrom**, 563 Pa. at 581, 763 A.2d at 395.  The **Lindstrom** Court held, with respect to the third **Althaus** factor, that "it is

---

[16] In **Griggs**, the United States Court of Appeals for the Third Circuit approvingly quoted the following:

> No person can be expected to guard against harm from events which are not reasonably to be anticipated at all, or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded. . . .  On the other hand, if the risk is an appreciable one, and the possible consequences are serious, the question is not one of mathematical probability alone. . . .  As the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution.

**Griggs**, 981 F.2d at 1436 (quoting W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* § 31, at 170-71 (5th ed. 1984)); **accord Schmoyer ex rel. Schmoyer v. Mexico Forge, Inc.**, 437 Pa. Super. 159, 164, 649 A.2d 705, 708 (1994).

evident that there is a risk of injury to the fleeing driver, and it is foreseeable that drivers who refuse to pull over when alerted to do so may be injured in their attempt to elude an officer." *Id.* at 585, 763 A.2d at 397. Our Supreme Court ultimately held that a police department has no such duty of care to a fleeing driver. *Id.* at 580, 763 A.2d at 395.

Similarly, in *Sharpe v. St. Luke's Hosp.*, 573 Pa. 90, 821 A.2d 1215 (2003), our Supreme Court held that with respect to drug testing, "termination of gainful employment[ ] would be a foreseeable consequence of a breach of the duty of reasonable care." *Id.* at 98, 821 A.2d at 1220. Children playing with butane lighters lacking child safety devices, our Supreme Court concluded, posed a substantial risk of injury and the evidence established that the lighter manufacturer could reasonably foresee that harm. *Phillips*, 576 Pa. at 660, 841 A.2d at 1009. The *Althaus* Court also concluded that the harm in that case—false accusation of sexual abuse—was substantial and foreseeable given the unique facts of that case. *Althaus*, 562 Pa. at 554, 756 A.2d at 1170.

In the case at bar, as stated above, the trial court asserted that spontaneous combustion of washed rags left in a dryer was not a foreseeable risk. Trial Ct. Op. at 7. We agree with the trial court that fire is an appreciable risk with serious potential consequences. *See Griggs*, 981 F.2d at 1436; *Phillips*, 576 Pa. at 660, 841 A.2d at 1009. Appellees were also aware of the phenomena of spontaneous combustion, although they

were unaware that grease could cause it. **See** Ex. B to Appellant's Br. in Resp. to Appellees' Mot. for Summ. J. Appellees' recognition of the general risk of spontaneous combustion, however, does not result in a duty unless Appellees could reasonably foresee that its conduct "creates an unreasonable risk" of spontaneous combustion. **See R.W.**, 585 Pa. at 348, 888 A.2d at 747; **Huddleston**, 700 A.2d at 460. Thus, we examine whether Appellees' conduct of laundering greasy rags[17]—specifically, leaving washed rags in the dryer after the dryer completed its cycle—foreseeably created an unreasonable risk of spontaneous combustion.

As discussed above, in **Lindstrom**, our Supreme Court held a driver fleeing from police foreseeably created an unreasonable risk of injury. **See Lindstrom**, 563 Pa. at 585, 763 A.2d at 397. Similarly, the **Sharpe** Court held that an inaccurate drug test result foreseeably created an unacceptable risk of employment termination. **See Sharpe**, 573 Pa. at 98, 821 A.2d at 1220. A lighter manufacturer, the **Phillips** Court held, could reasonably foresee that lighters without child safety devices could result in an unreasonable risk of fire or other harm. **See Phillips**, 576 Pa. at 660, 841 A.2d at 1009. Finally, a false allegation of sexual abuse was both a substantial harm and foreseeable under the circumstances of that case. **See Althaus**, 562 Pa. at 554-55, 756 A.2d at 1170.

---

[17] As noted **supra**, we view the record in the light most favorable to Appellant.

Unlike the conduct examined by those courts, however, we do not believe Appellees' conduct of laundering rags—specifically, not promptly removing the rags from the dryer—foreseeably created an unreasonable risk of spontaneous combustion. **See R.W.**, 585 Pa. at 348, 888 A.2d at 747. Even given the gravity of the harm posed by spontaneous combustion, we question whether Appellees, let alone the general public, would have reasonably anticipated spontaneous combustion under these circumstances. **See id.**; **see also Griggs**, 981 F.2d at 1436. After weighing the social utility of laundering rags against the nature and foreseeability of spontaneous combustion, we find that these factors weigh against imposing the affirmative duties proposed by Appellant. **See Althaus**, 562 Pa. at 555, 756 A.2d at 1170.

The fourth **Althaus** factor is the consequences of imposing a duty upon the actor. **Althaus**, 562 Pa. at 553, 756 A.2d at 1169. In **Althaus**, our Supreme Court held that expanding therapists' duty of care to non-patients would alter the therapeutic relationship of professional confidentiality. **Id.** at 555-56, 756 A.2d at 1170-71. The consequences of imposing such a duty, the **Althaus** Court noted, would deter victims of sexual abuse from seeking treatment if therapists could not guarantee confidentiality. **Id.** Thus, our Supreme Court held this factor weighed against imposing a duty. **Id.** at 556, 756 A.2d at 1171.

In *Thierfelder v. Wolfert*, 617 Pa. 295, 52 A.3d 1251 (2012), our Supreme Court resolved "[w]hether, for purposes of determining professional negligence, a general practitioner who provides mental health treatment to a patient is held to the same higher duty as a specialist in psychiatry or psychology," "which, it is further alleged, entails a specific and strict duty to avoid sexual relations with patients." *Id.* at 311, 317, 52 A.3d at 1261, 1264. With respect to the fourth *Althaus* factor, our Supreme Court observed that

> in today's world, it is common for general practitioners to provide their patients with some form of front-line mental or emotional care; and this care may go so far as to include the prescription of medications to relieve stress-induced anxiety and even antidepressants. The proffered duty and tort would impose significant consequences on general practitioners rendering such care who become sexually involved with a patient, solely because of incidental mental health treatment. Ours is a fluid and complex society, where concepts of free will and personal responsibility hold some sway. The prophylactic absolute duty of avoidance of sexual contact proffered here excises those concepts in one narrow situation deriving from the special circumstances, vulnerability, and potential exploitation that may arise from a course of mental health treatment, based upon a phenomenon familiar to specialists in the field. To hold general practitioners providing incidental care to that same standard would have the effect of discouraging general practitioners from rendering what appears to have become, by now, relatively routine attention to their patients' mental and emotional well-being.

*Id.* at 337-38, 52 A.3d at 1277. The *Thierfelder* Court held that the effects of imposing such a duty were significant and that "this again is a question of

policy not particularly suited to common law resolution by the judiciary." ***Id.*** at 338, 52 A.3d at 1277.

Instantly, Appellant's proposed solution is to impose an absolute duty upon all customers laundering bar rags in a public laundromat "to learn the risks associated with that activity and the precautions to be taken." Appellant's Brief at 33. Appellant's recommended precautions include prompt removal of rags from the dryer, using a degreasing solution prior to washing the rags, "fully wash[ing] the rags to ensure the removal of all vegetable oils," or using a "commercial restaurant laundry service to clean the oil soaked rags." ***Id.*** at 30. Appellant's suggested mandate affects all public laundromats, users of same, and commercial restaurant laundry services. Appellant opines the proposed duty imposes only a "modest burden." ***Id.*** As noted above, the trial court disagreed with Appellant. Trial Ct. Op. at 9.

The public's interest in preventing fires is evident. ***Cf. Phillips***, 576 Pa. at 661, 841 A.2d at 1010. But the consequences of imposing Appellant's duty on the public—including customers laundering bar rags in a public laundromat—based on the instant record, is less clear. Appellant has not referred us to anything in the record substantiating its bald claim that the public consequences are "modest." ***Cf. Thierfelder***, 617 Pa. at 337-38, 52 A.3d at 1277; ***Althaus***, 562 Pa. at 555, 756 A.2d at 1170. We are, therefore, reluctant to render a social policy judgment and impose a

Commonwealth-wide duty based solely on Appellant's unsupported characterization of the burden on the public. *Cf. Seebold*, 618 Pa. at 653, 57 A.3d at 1245. We are in accord with the trial court's holding. *See* Trial Ct. Op. at 9-10; *see also Seebold*, 618 Pa. at 650, 57 A.3d at 1243 (recognizing *de novo* standard of review). At best, without more, this factor does not weigh in Appellant's favor.

Finally, we address "the overall public interest in the proposed solution," the last *Althaus* factor. *Althaus*, 562 Pa. at 553, 756 A.2d at 1169. For example, in *Althaus*, our Supreme Court held that competing public interests weighed against imposing a duty on a therapist treating a child to the child's parents for negligent diagnosis and treatment of alleged child abuse:

> There are certainly compelling arguments that a person falsely accused of child abuse should have a remedy in law and our decision today would not prevent all such actions against liable parties. However, the societal interest in encouraging treatment of child abuse victims and maintaining the trust and confidentiality within the therapist/patient relationship dictates against the imposition of a duty of care beyond that owed to the patient.

*Id.* at 556-57, 756 A.2d at 1171 (citation and footnote omitted). The *Althaus* Court concluded that the public's interest in the proposed solution of imposing a duty on a therapist to a non-patient was greatly outweighed by the public's interest in the treatment of child abuse victims. *Id.* In *Thierfelder*, our Supreme examined the "public interest in [the] proposed

'solution' of extending a mental health specialist's duty to refrain from sexual involvement with patients to general practitioners who undertake some incidental treatment of patients' mental and emotional symptoms." ***Thierfelder***, 617 Pa. at 338, 52 A.3d at 1277-78. The Court acknowledged the numerous issues involving physician liability and "the complexity involved in any expansion or contraction of [liability] exposure." ***Id.*** at 338, 52 A.3d at 1278. Imposing such an absolute duty, our Supreme Court held, would have a "high social cost" and "discourage general or primary care doctors from meeting their patients' manageable mental and emotional needs[.]"[18] ***Id.*** at 339, 52 A.3d at 1278. Our Supreme Court thus weighed the fifth ***Althaus*** factor against the imposition of such a duty. ***Id.*** The ***Thierfelder*** Court recognized, as did the ***Seebold*** Court, that courts are ill-suited to setting public policy. ***Id.*** at 339-40, 52 A.3d at 1278; ***see Seebold***, 618 Pa. at 653 & n.19, 57 A.3d at 1245 & n.19.

Instantly, as set forth above, Appellant proposes requiring that all customers laundering bar rags educate themselves about the risks, promptly remove rags from the dryer, use degreaser prior to washing rags, thoroughly wash rags to remove all oils, or use a commercial restaurant laundry service to clean oily rags. ***See*** Appellant's Brief at 30, 33.

---

[18] Further, the ***Thierfelder*** Court noted such a duty would not deter doctors who would intentionally engage in such behavior and there were other causes of action that would not require the imposition of an absolute duty. ***Id.*** at 1278.

Appellant, although noting the public's interest in preventing fires, *id.* at 32-33, does not discuss the public's interest in its proposed requirements. *See Thierfelder*, 617 Pa. at 338, 52 A.3d at 1277-78. Appellant, however, suggests that imposing these mandates furthers the Commonwealth's interest in preventing fires. *See* Appellant's Brief at 32. The trial court noted that imposing Appellant's proposed duties on the public did not feasibly reduce the risk of fire. Trial Ct. Op. at 9.

We agree that the Commonwealth has an interest in preventing fires. *Cf. Phillips*, 576 Pa. at 661, 841 A.2d at 1010. But identifying the public's interest in Appellant's proposed mandates is a different inquiry. *Cf. Thierfelder*, 617 Pa. at 338, 52 A.3d at 1278 (conceding complexity of imposing safeguard of absolute duty best left to, *e.g.*, legislature). Appellant simply does not discuss the social cost of its solutions. *Cf. id.* (noting high social cost of proposed solution). The parties also did not discuss the availability of other legal causes of action. *Cf. id.*; *Althaus*, 562 Pa. at 556, 756 A.2d at 1171. At best, because Appellant failed to address the potential social costs of its edicts, this factor weighs against imposing a duty. *Cf. Thierfelder*, 617 Pa. at 338, 52 A.3d at 1278; *cf. generally Seebold*, 618 Pa. at 653, 57 A.3d at 1245.

After weighing the "risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and the consequences of placing

that burden on the actor," **Althaus**, 562 Pa. at 553, 756 A.2d at 1169, the balance of the **Althaus** factors does not predominate in Appellant's favor. **See Seebold**, 618 Pa. at 653-54, 57 A.3d at 1245. This case, focused on the individual interests of Appellant, does not necessarily translate into the broader realm of whether this Commonwealth's interests are best served by imposing a duty upon the public to, *e.g.*, preemptively guarantee the absence of flammable oils prior to using a laundromat dryer. **See id.** (noting adversary system of justice ill-suited for imposing Commonwealth-wide duty). The Legislature's policy hearing process, and not the court's adversarial process, as our Supreme Court has repeatedly emphasized, is best suited to setting public policy. **See id.**; **accord Conway v. Cutler Grp.**, 80 MAP 2013, 2014 WL 4064261, at *5, 2014 Pa. LEXIS 2084, at *13-*15 (Pa. Aug. 18, 2014). Accordingly, given the instant record, we adhere to our default position of not imposing a new affirmative duty and defer to our Legislature. **See Seebold**, 618 Pa. at 653-54, 57 A.3d at 1245.

For its last issue, Appellant contends the trial court improperly accepted Appellees' factual assertion that they did not know and could not have reasonably known that laundering bar rags could spontaneously combust. Appellant maintains that the trial court accordingly erred as a matter of law by rendering credibility determinations in favor of Appellees. We disagree with Appellant's argument.

Appellant's argument confuses the existence of a duty—a question of law—and the burden of proof with respect to whether a duty has been breached—a question for the fact-finder. *See Emerich*, 554 Pa. at 233, 720 A.2d at 1044. The trial court did not improperly make credibility determinations and weigh conflicting evidence adverse to Appellant because it held that Appellees, as a matter of law, owed no duty of care. *See id.*; *see also* Trial Ct. Op. at 5, 10. Conversely, because Appellees owed no duty of care as a matter of law, the trial court did not have to construe facts or render credibility determinations. *See Emerich*, 554 Pa. at 233, 720 A.2d at 1044. Accordingly, having discerned no error of law with the trial court's grant of summary judgment, we affirm the order below. *See Gutteridge*, 804 A.2d at 651.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/29/2014